[No. 3,091.]

# ELLEN R. VAN VALKENBURG v. ALBERT BROWN.

STATUS OF CITIZENSHIP NOT CONFERRED BY RECENT AMENDMENTS TO THE FEDERAL CONSTITUTION.—No white person born within the limits of the United States and subject to their jurisdiction, or born without those limits and subsequently naturalized under their laws, owes his status of citizenship to the recent amendments to the Federal Constitution.

PURPOSE OF THE FOURTEENTH AMENDMENT.—The purpose of the Fourteenth Amendment to the Constitution of the United States was to confer the status of citizenship upon a numerous class of persons domiciled within the limits of the United States who could not be brought within the operation of the naturalization laws because native born, and whose birth, though native, had at the same time left them without the status of citizenship. Such persons were not white persons, but in the main were of African blood,

who had been held in slavery in this country, or having themselves never been held in slavery, were the native-born descendants of slaves.

PRIVILEGES AND IMMUNITIES OF CITIZENSHIP. — Under the Fourteenth Amendment to the Federal Constitution, the privileges and immunities of citizens of the United States are guaranteed and protected in every State beyond the operation of State laws.

THE ELECTIVE FRANCHISE NOT AN IMMUNITY OF CITIZENSHIP. — The elective franchise is not one of the immunities or privileges intended in the first section of the Fourteenth Amendment to the Federal Constitution.

POWER OF STATE TO DETERMINE WHO MAY VOTE NOT CURTAILED. — The mere power of the State to determine the class of inhabitants who may vote within her limits, is not curtailed in the Fourteenth Amendment.

FEMALES NOT MADE VOTERS BY THE FIFTEENTH AMENDMENT. — The Fifteenth Amendment took away the authority of the State to discriminate against citizens of the United States on account of either race, color, or previous condition of servitude; but the power of exclusion upon all other grounds, including that of sex, remains intact.

APPEAL from the District Court of the Third Judicial District, County of Santa Cruz.

The facts are stated in the opinion.

*Albert Hagan,* for Appellant.

The office of the Fourteenth Amendment is not to simply secure to all persons equal capacities before the law, but it grants to all persons who are citizens the broadest rights which attach themselves to every citizen of the Republic. (*Live Stock Association* v. *Crescent City,* 1 Abbott, 396.)

Suffrage is a fundamental right—one of the privileges of the citizen by virtue of citizenship in a free government. As soon as one is raised to the dignity of a citizen he can claim the right of suffrage as one inherent in a Republic and fundamental in its nature. (*Abbott* v. *Bailey,* 2 Kent, Sec. 72; *Corfield* v. *Correll,* 6 Pick. 42.)

California yet retains the word "white" in her organic law prescribing the qualifications of electors, yet the negro votes here by virtue of the Constitution of the United States. If the right of suffrage belongs to every citizen, by virtue of the organic law of the Union, then no State can prohibit

any citizen from voting. It needs no prohibition in the Constitution of the United States to prevent States from disfranchising any citizen, for, if once invested with the fundamental right to vote, no State can destroy, no Legislature can abolish it.

To say that the Fifteenth Amendment goes far to interpret the Fourteenth Amendment and to thereby grant or imply that the States may restrict the right of suffrage as to other than male citizens, is an admission that the Fourteenth Amendment by its terms does away with the right of the several States to any restriction over the right to vote. States may regulate the manner of voting, but cannot take away the right to vote, if the latter is conceded to be a fundamental right guaranteed by the Constitution of the United States.

*Albert Heath*, for Respondent.

The respondent admits that the appellant is a citizen of the United States, over the age of twenty-one years, but denies that under and by virtue of the laws of the State of California, the Clerk of Santa Cruz County is authorized to place upon the Great Register of said county the name of a female, and refers the Court to the following authorities, viz: Sec. 1, Art. II, of the Constitution of the State of California; Sec. 2 of the Registry Act, and the amendments thereto, approved March 30th, 1868.

By the Court, WALLACE, C. J.:

The plaintiff applied to the Court below for a writ of mandamus against the defendant, who is the County Clerk of the County of Santa Cruz, to compel him to inscribe her name in the Great Register, and enroll her as a legal voter of said county. Judgment having been rendered refusing the writ, she brings this appeal.

It appears that she is "a white female resident and citizen of the United States and of the State of California, over the age of twenty-one years, and for more than one year last past a resident of Santa Cruz County," and was born within the limits and subject to the jurisdiction of the United States.

The Court below held that by reason of her sex she was disqualified to exercise the elective franchise; and it is admitted that if her claim in that respect is to be determined alone by the Constitution and laws of this State, excluding, as they do, persons of her sex from the exercise of the elective franchise, the judgment below is correct, and should be affirmed here.

But it is claimed that she is entitled to registration as a voter by reason of the first section of the recent amendment to the Federal Constitution of July 20th, 1868, known as the Fourteenth Amendment. That section is in the following words:

"Article 14, Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

1. It is claimed that the plaintiff is a citizen of the United States and of this State. Undoubtedly she is. It is argued that she became such by force of the first section of the Fourteenth Amendment, already recited. This, however, is a mistake. It could as well be claimed that she became free by the effect of the Thirteenth Amendment, by which slavery was abolished; for she was no less a citizen

than she was free before the adoption of either of these amendments. No white person born within the limits of the United States, and subject to their jurisdiction, or born without those limits, and subsequently naturalized under their laws, owes the status of citizenship to the recent amendments to the Federal Constitution. The history and aim of the Fourteenth Amendment is well known, and the purpose had in view in its adoption well understood. That purpose was to confer the status of citizenship upon a numerous class of persons domiciled within the limits of the United States, who could not be brought within the operation of the naturalization laws because native born, and whose birth, though native, had at the same time left them without the status of citizenship. These persons were not white persons, but were, in the main, persons of African descent, who had been held in slavery in this country, or, if having themselves never been held in slavery, were the native-born descendants of slaves. Prior to the adoption of the Fourteenth Amendment it was settled that neither slaves, nor those who had been such, nor the descendants of these, though native and free born, were capable of becoming citizens of the United States. (*Dred Scott* v. *Sanford*, 19 How. 393.) The Thirteenth Amendment, though conferring the boon of freedom upon native-born persons of African blood, had yet left them under an insuperable bar as to citizenship; and it was mainly to remedy this condition that the Fourteenth Amendment was adopted.

This is recent history—familiar to all.

2. It is next claimed that, by whatever means the plaintiff became a citizen of the United States, her privileges and immunities as such citizen cannot be abridged by State laws; and this is true. The purpose and the effect of the amendment, in this respect, is to place the privileges and immunities of citizens of the United States beyond the operation of State legislation. Those immunities and privileges, what-

ever they may be, are guaranteed and protected in every State by this clause in the Federal Constitution.

3. It is urged that, among these privileges and immunities, is included the privilege of the plaintiff to exercise the elective franchise within the limits of this State, even in disregard of the Constitution and laws of the State, which unquestionably exclude persons of her sex. And this brings us to inquire what is meant by the phrase "privileges or immunities of citizens of the United States," as used in this amendment.

This phraseology was known in our history anterior to the formation of the present Federal Union. In the articles of confederation between the American States it was provided "that the free inhabitants of each of these States (paupers, vagabonds, and fugitives from justice excepted,) shall be entitled to all privileges and immunities of free citizens of the several States, and the people of each State shall, in every other, enjoy all the privileges of trade and commerce, subject to the same duties, impositions, and restrictions as the inhabitants thereof respectively," etc. (Art. IV.) The term "privileges and immunities" was therefore not a new one when, in the second section of the fourth article of the Federal Constitution, as originally ratified, it was declared that "the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States." The words "*privileges and immunities*" had at that time acquired a distinctive meaning and a well-known signification. They comprehended the enjoyment of life and liberty, and the right to acquire and possess property, and to demand and receive the protection of the Government in aid of these. They included the right to sue and defend in the Courts, to have the benefit of the writ of habeas corpus, and an exemption from higher taxes or heavier impositions than were to be borne by other persons under like conditions and circumstances.

The Federal Constitution went into operation in March, 1789, and within a few years thereafter—in 1797—a question came before the General Court in Maryland in respect to the meaning of the words "privileges and immunities" as thus employed in that instrument.    The question was argued by the most eminent counsel in the State, and among them was the celebrated Luther Martin, then Attorney General.    Upon this point the Court said:  "Privilege and immunity are synonymous, or nearly so.    Privilege signifies a peculiar advantage, exemption, immunity;  immunity signifies exemption, privilege.    The peculiar advantages and exemptions contemplated under this part of the Constitution may be ascertained, if not with precision and accuracy, yet satisfactorily.    By taking a retrospective view of our situation antecedent to the formation of the first General Government, or the Confederation, in which the same clause is used *verbatim*, one of the great objects must occur to every person, which was the enabling of the citizens of the several States to acquire and hold real property in any of the States, and deemed necessary, as each State was a sovereign and independent State, and the States had confederated only for the purposes of general defense and security, and to promote the general welfare.    It seems agreed from the manner of expounding or defining the words 'immunities and privileges' by the counsel on both sides, that a particular and limited operation is to be given to those words, and not a full and comprehensive one.    It is agreed it does not mean the right of election, the right of holding office, the right of being elected.    The Court are of opinion it means that the citizens of all the States shall have the peculiar advantage of acquiring and holding real as well as personal property, and that such property shall be protected and secured by the laws of the State in the same manner as the property of the citizens

of the State is protected," etc.   (*Campbell* v. *Morris*, 3 Harr. & McH. 554.)

The expression, "privileges and immunities," had been found in the Constitution for a period of near eighty years prior to the adoption of the Fourteenth Amendment, and had never been supposed to include the right to the exercise of the elective franchise.   Notwithstanding the citizens of each State were, during all that time, entitled to all the privileges and immunities of citizens in the several States, it was never supposed that the citizen of any State might, upon his removal into any other State, lawfully claim to vote there because he had exercised that privilege in the State from which he had just emigrated.

In point of fact the States have generally conferred the privilege of the elective franchise upon such of their male inhabitants as had become citizens of the United States, if of the requisite age, etc.   This circumstance has given rise to a notion in some quarters that the privilege of voting and the status of citizenship are necessarily connected in some way—so that the existence of the one argues that of the other.   But the history of the country shows that there was never any foundation for such a view.   Thus citizens of the United States, resident in the State of Virginia, were prevented by State law from voting there, unless seized of a freehold estate; and citizens of the United States, resident in Massachusetts, were by the laws of that State denied the privileges of the elective franchise, unless owners of personal property to a designated amount.   While the privilege of voting was thus, by State laws, withheld in those States from persons who were citizens of the United States, the elective franchise was in other States of the Union conferred by State laws upon persons who were not citizens.   In New York and North Carolina, for instance, at an early day the privilege of voting was conferred upon negroes, persons of African descent, under certain conditions.   These were not

citizens of the United States, nor then even capable of
becoming such.   In Wisconsin and Michigan, though
negroes were excluded, persons of the Indian blood were
admitted; and in Indiana, Illinois, Minnesota, and other
States, unnaturalized foreigners were by State laws allowed
to vote—following in this respect the early policy of the
Federal Government, who, in the ordinance of 1787, for the
government of the Northwestern Territory, had permitted
the elective franchise to the unnaturalized French and
Canadians, of whom the population of that Territory was
then largely composed.   It will be found that from the
earliest periods of our history the State laws regulated the
privilege of the elective franchise within their respective
limits, and that these laws were exactly such as local in-
terests, peculiar conditions, or supposed policy dictated, and
that it was never asserted that the exclusion of any class of
inhabitants from the privilege of voting amounted to an
interference with the privileges of the excluded class as
citizens.   As was well said by Judge MILLS, of the Court of
Appeals of Kentucky:   "The mistake on the subject arises
from not attending to a sensible distinction between political
and civil rights.   The latter constitute the citizen, while
the former are not necessary ingredients.   A State may
deny all her political rights to an individual, and yet he may
be a citizen.   The rights of office and suffrage are political
purely, and are denied by some or all the States to part of
their population, who are still citizens.   A citizen, then, is
one who owes the Government allegiance, service, and
money by way of taxation, and to whom the Government,
in turn, grants and guarantees liberty of person and of con-
science, the right of acquiring and possessing property, of
marriage and the social relations, of suit and defense, and
security in person, estate, and reputation.   These, with some
others which might be enumerated, being guaranteed and
secured by Government, constitute a citizen.   To aliens we

extend these privileges by courtesy; to others we secure them—to male as well as female—to the infant as well as the person of hoary hairs." (1 Litt. R. 342.)

4. But the language of the *second* section of the Fourteenth Amendment itself demonstrates that the elective franchise is not one of the "privileges or immunities" mentioned in the *first* section, and as such not to be abridged or taken away by State laws.

The second section of the amendment (so far as material upon this point) is in the following words:

"Section 2. Representatives shall be apportioned among the several States, according to their respective numbers. But when the right to vote * * * is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, * * * the basis of representation therein shall be reduced" * * * etc.

It will thus be seen that by this second section of the Fourteenth Amendment it is expressly provided that if the State law shall deny the elective franchise to the citizens of the United States therein mentioned, the basis of Federal representation to which such State would otherwise be entitled shall be thereupon and in consequence of such denial readjusted and reduced in a designated ratio. If the power of the State to deny the elective franchise to a citizen of the United States had been absolutely taken away by the first section, then a State law enacted for that purpose would necessarily be absolutely void—as a bill of attainder passed, or *ex post facto* law enacted, would be void, as being in contravention of the inhibitions of Article I, Section 10, of the Federal Constitution. But by the second section of the amendment under consideration it is provided that the action of the State authority denying the right of citizens of the United States to vote, so far from being null and void, shall

furnish a new basis of Federal numbers in the State, upon which a new apportionment of representation in Congress is to follow.    It is inconceivable that such constitutional consequences are to follow the doing of an act which the Constitution had just forbidden to be done at all.

5. The Fifteenth Amendment to the Constitution was adopted nearly two years after the Fourteenth.    It provides that the right of a citizen of the United States to vote shall not be denied on account of *race*, color, or *previous condition of servitude*.    If, under the Fourteenth Amendment already adopted, the right of a citizen to vote was not to be denied upon *any ground whatsoever*, what necessity or propriety in subsequently providing that it should not be denied upon either of three enumerated grounds?    It will be seen that the construction claimed for the Fourteenth Amendment by the counsel for the plaintiff would leave nothing for the Fifteenth to operate upon.

Many other and hardly less cogent reasons might be mentioned going to show that the elective franchise is not one of the immunities or privileges secured by the first section of the Fourteenth Amendment.    The mere power of the State to determine the class of inhabitants who may vote within her limits was not curtailed in the Fourteenth Amendment.

The Fifteenth Amendment took away her authority to discriminate against citizens of the United States on account of either race, color, or previous condition of servitude; but the power of exclusion upon all other grounds, including that of sex, remains intact.

Judgment affirmed.