[Decided August 14, 1888.]

## NEVADA M. BLOOMER *v.* JOHN TODD, J. E. GANDY, AND H. A. CLARKE.

ELECTION AND VOTERS—TERRITORIES—WOMAN SUFFRAGE—ORGANIC ACT— CITIZENS OF THE UNITED STATES.—The act of the legislative assembly, approved January 18, 1888 (Sess. Laws 1887–1888, p. 93), purporting to confer the right of suffrage upon women, is void as in conflict with the organic act of the territory, providing that every white male inhabitant above the age of twenty-one years, resident in the territory, shall be a voter at the first election, but the qualification of voters at subsequent elections shall be prescribed by the legislative assembly of the territory, provided that the right of suffrage shall be exercised only by citizens of the United States above the age of twenty-one years, or by those above that age who have declared on oath their intention to become such; the word "citizen," as used in the act, to be construed and read only as male citizen, etc.

ERROR to the District Court holding terms at Spokane Falls. Fourth District.

Nevada H. Bloomer, the plaintiff below, sued the defendants John Todd, J. E. Gandy, and H. A. Clarke, judges of election, and conducting the regular municipal election in one of the wards of the city of Spokane Falls, in April, 1888, for fraudulently, maliciously, and without sufficient cause, and with intent to injure her, refusing to receive her ballot, which she tendered to said judges, containing the names of the persons for whom she intended to vote for the office of mayor and for other offices to be filled at said election. The plaintiff alleged that at the time of the election she was a female citizen of the United States over twenty-one years of age, and had been for more than one year prior to said term a resident, a citizen, and a qualified elector of the territory, and had for more than one month immediately prior to said election resided in said city, and for more than five days in the ward in which she offered to vote, as required by law, to entitle her to vote. The plaintiff prayed judgment for damages in the sum of $5,000. The defendants interposed a demurrer, alleging insufficiency of facts in the complaint to constitute a cause of action. Demurrer sustained to the complaint, and plaintiff failing to amend, judgment for costs was rendered in favor of defendants, from which plaintiff appealed.

*Mr. William M. Murray,* for the Plaintiff in Error.

If the allegations of the complaint in this action are true, plaintiff is entitled to recover damages for the wrong done her. (*Murphy* v. *Ramsey,* 114 U. S. 15.) The privilege of suffrage is one which may be granted or withheld at the will of the sovereign governing power. (*Van Valkenburgh* v. *Brown,* 13 Am. Rep. 136; *Minor* v. *Happersett,* 21 Wall. 162; *Spencer* v. *Board of Registration,* 29 Am. Rep. 582.) The congress of the United States has the sovereign power to legislate for the territories. It may exercise that power directly, or it may, as is usual, delegate it to territorial legislative assemblies; but even in case of such delegation, it has the power to approve or disapprove—"to declare a valid act void or a void act valid." (*National Bank* v. *County of*

*Yankton,* 101 U. S. 129; *Murphy* v. *Ramsey,* 114 U. S. 15.)
The legislative power in the territories is vested in the governor and legislative assembly. (U. S. Rev. Stats., sec. 1846.)
It shall extend to all rightful subjects of legislation not inconsistent with the constitution and laws of the United States.
(Rev. Stats., sec. 1851.) All laws passed by the legislative
assembly and governor shall be submitted to congress, and,
if disapproved, shall be null and of no effect. (U. S. Rev.
Stats., sec. 1850.) And after providing the qualifications of
voters at the first election in territories thereafter organized,
congress further made the following provision: "Section
1860. At all subsequent elections, however, in any territory
hereafter organized by congress, as well as at all elections
in territories already organized, the qualifications of voters,
and of holding office, shall be such as may be prescribed by
the legislative assembly of each territory, subject, nevertheless, to the following restrictions on the power of the legislative assembly, namely: The right of suffrage and of holding office shall be exercised only by citizens of the United
States above the age of twenty-one years, and by those above
that age who have declared on oath, before a competent court
of record, their intention to become such and have taken an
oath to support the constitution and government of the
United States." The qualification of voters is a rightful
subject of legislation over which congress has, in the territories, sovereign power either to act itself or to delegate the
power to the territorial legislature. That power is clearly
conferred by the foregoing enactments, (1) by section 1851,
(2) by the express grant of power contained in section 1860,
limited only by the restrictions contained in the latter section. (*Van Valkenburgh* v. *Brown,* 43 Cal. 43, 13 Am. Rep.
136; *Minor* v. *Happersett,* 21 Wall. 162; *Spencer* v. *Board of
Registration,* 1 McArthur, 29 Am. Rep. 582.) It must be
presumed that congress intended the statute to be construed
according to the plain and ordinary import of the language
used; and that import grants the power to legislate on the
subject. The Territory of Wyoming had adopted woman
suffrage prior to the revision of the statutes; and if that be

so, the enactment of the statutes in the revision indicates the congressional intent; and also, congress having absolute power to declare "a valid act void or a void act valid" in the territories. (*National Bank* v. *County of Yankton*, 101 U. S. 129.) Its failure for many years to abrogate the woman suffrage law of Wyoming indicates its intention in the foregoing statutes, or at least its assent to woman suffrage.    In this territory, the legislative enactments must be submitted to congress and, if disapproved by congress, shall be null and of no effect. (U. S. Rev. Stats., sec. 1850.) And it may well be argued that the suffrage law of 1883 in this territory, though it remained in force for three years, and the present one, having never been disapproved, are impliedly confirmed by congress, or at least that the right of the territories to legislate on the subject is recognized.   The Supreme Court of the United States recognized the right of the territories to legislate on this subject and to confer the right of suffrage upon women. (*Murphy and others* v. *Ramsey and others*, 114 U. S. 15.)   In the case last cited, appealed from Utah, five cases are considered together. They are cases brought against election officers to recover damages for refusing the right to register and vote.   In several of the cases plaintiffs were women.   The question of sex was not directly at issue, but the court evidently recognized the right of the territorial legislature to confer suffrage on women, and in two of the cases wherein women were plaintiffs reversed the judgment of the territorial court rendered upon defendants' demurrer to the complaint and remanded the cases.   The territory, through its proper legislative authority, has expressed its will, and until congress interferes that will is supreme.  No reason exists in natural law why that power should not be exercised in favor of woman suffrage.   She is equally interested with men in the good order and morality of society, in the prosperity of the state, in the proper administration of government, in the welfare of the family, the education of the young, and, in fact, everything for which governments are established.

*Mr. A. S. Austin,* as *amicus curiæ,* filed a brief, and argued for the Plaintiff in Error.

*Mr. George Turner, Mr. George M. Forster,* and *Mr. J. M. Kinnaird,* for the Defendants in Error.

The sole and only question in the case is: Are females qualified electors under the laws of Washington Territory? If answered affirmatively, the lower court erred in not overruling the demurrer; if answered negatively, the court committed no error in sustaining that demurrer. We maintain that the act of the territorial legislature, entitled "An act prescribing the qualifications of electors in the Territory of Washington," approved January 18, 1888, is in conflict with the organic act of Washington Territory, and is void. Section 1859 and section 1860 of the Revised Statutes of the United States are not a correct reprint of the organic act of Washington Territory, and in case of discrepancy between the two, the latter, being an act of a local character, is the one whose provisions must govern. (U. S. Rev. Stats., sec. 5596.) The organic act of this territory is found in 10 Statutes at Large, 172, and all of its provisions relating to the matter of suffrage are contained in section 5 of the act. We call attention to the discrepancy between the language of the Revised Statutes and that of the original act, because of the argument which has been drawn from the peculiar wording employed in the revision. It is argued, because suffrage is confined by section 1859 of the Revised Statutes, at the first election, to "male citizens," etc., while, by section 1860, power is given to the legislature to regulate the matter of future elections at pleasure, subject only to the limitation, among others, that it must be confined to "citizens," omitting the word "male," that, therefore, congress must have had it in mind that the territory might wish, at some future time, to confer suffrage on females, and that the matter was designedly left open for it to do so when so minded. But in the original act, as will be seen, the word "citizens," used in the proviso, stands opposed to the words "white male inhabitants," used in the enacting

clause, and as thus used the failure to limit the word "citizen" by the word "male" is not significant. The word "citizen," standing opposed to the word "inhabitant," any qualification of it would have weakened force which it was intended it should have in that connection. We claim that section 5 of that act, which limits the power of the legislature to confer the right of suffrage to citizens of the United States, or to persons who have declared their intention to become such, etc., is to be read as if the word "male" was inserted before the word "citizens." Those who insist on the interpretation of statutes according to their literal reading refuse to understand the philosophy of the law. Every new statute is but a part in the great whole. If the meaning of words could be measured with mathematical accuracy, those parts would be regular, and their influence on the surrounding parts uniform. But words cannot be so measured. Hence legislators, while endeavoring, usually, to make their meaning as definite as possible, do not guard against every possible construction which may be placed on their work. To attempt to do so would be to make their task interminable. It is, therefore, wisely left to the courts to extend statutes by construction when the words are not broad enough to effectuate the legislative intent; to limit by interpretation where they are too broad. That this duty, which pertains to the courts under any known system of law, is sometimes perverted, and the law which the legislature intended to enact refined away, cannot be denied. But when it is performed to the end that the legislative intent may be effectuated, none but the ignorant or vicious will cavil. To illustrate this principle counsel cited Bishop on Statutory Crimes, second edition, section 117 *a.* Another important principle of construction is that a constitution or a statute is to receive an unvarying interpretation. It is not to be one thing to-day and another to-morrow, but what it was when enacted or adopted that it is and shall remain until abrogated. On this point counsel cited Cooley's Constitutional Limitations, pages 54, 55. Two minor propositions are established by

the learned authors above cited. They are: First, that in construing the organic act it is to be considered in connection with the common law, and with prior constitutional and statutory law, to see how, if at all, its general terms are limited and controlled by the former; second, treating it in this way, and looking at it in the light of contemporary history in the year 1853, the construction that would have been placed on it then is the construction which it must receive now. Let us examine section 5 of the organic act by the light of the constitution and laws of the United States, including the other parts of the organic act of which it is a part. In the first place, the government of the United States, as designed by the fathers of the republic, is a government of men. The president and vice president are to be men. The justices of the Supreme Court are to be men. The senators and representatives are to be men. Who will deny this? Yet it cannot be proven by a literal reading of the constitution, but is established by an implication as strong, but no stronger, than that which we are claiming in this case. The governments of the territories are mere agencies of the United States. Is there not a strong implication that this government of men did not intend to depart from the framework of their own government in establishing local and subordinate governments in the territories? Provision was made in 1817 for the election of delegates to congress from the territories. (3 U. S. Stats. at Large, 363.) Neither this act, nor any subsequent act, fixes the qualifications of delegates, except that section 1906 of the Revised Statutes provides that the delegates must be citizens of the United States. Congress never intended that females should be admitted to the house as territorial delegates in congress. Hence, congress never intended that females should vote in the territories. It would be contrary to the genius of our institutions, and to the teachings of government in which our public men were educated, to disqualify from the execution of such a trust one-half of the voters of the community. It is declared by section 1994 of the Revised Statutes that all women, whose husbands are

citizens, are themselves citizens. (*Kelley* v. *Owen*, 7 Wall. 496.) Unless our construction of the organic act is sustained it results that an alien woman, by the mere fact of marriage to a citizen, may be thereby qualified to take part in the government of the territory and in the formation of the new state. A female does not absolve herself from allegiance by marriage with an alien. (*Shanks et al.* v. *Dupont,* 3 Peters, 242.) Congress did not intend that females, married to aliens, should participate in the governments in the territories created by virtue of the constitution of the United States; or did it forget or disregard the common-law principle, founded in nature, and as vitally true to-day as it ever was, that married women are under the influence and control of their husbands. Female suffrage is entirely inconsistent with the scheme of government provided by the organic act itself. That act provides for the appointment of a governor, a secretary, one chief justice and associate justices, a marshal, and United States attorney. That these officers are to be men is derived only from implication, yet the position has never been questioned and probably never will be. The legislative branch of the government is also composed exclusively of men. (Rev. Stats. of U. S., secs. 1846, 1859.) The ordinance of 1789 for the government of the Northwest Territory should not be omitted from view. This ordinance antedates the constitution itself, and it declares itself to be, and has been declared by the Supreme Court of the United States to be, "articles of compact" between the original states and the people of the territories. This ordinance was extended to this territory when the latter was organized. (9 Stats. at Large 30 Cong., 329, sec. 14; 10 Stats. at Large, 175, sec. 12.) That ordinance established a government of men, in terms, and it provided that the territories should, when the requisite population was acquired, be admitted into the Union as states, "the constitution and government to be republican, and in conformity with the principles contained in these articles." The conclusion that congress had male citizens only in mind, when it framed our organic act, is strongly

reinforced by a consideration of the status of females in the government of the country at the time the organic act was adopted. This status is stated fully in two important cases, viz: *Minor* v. *Happersett,* 21 Wall. 162; *Robinson's Case,* 131 Mass. 376. The last cited case, in which the opinion was rendered by GRAY, C. J., now on the Supreme Bench of the United States, illustrates the present case in all its bearings. The word "citizen" arose for a consideration in that case. The same rule of construction which should be applied here was applied there. The history of the common and statute law is carefully and elaborately stated, showing the relation borne in the government by females, both under our own and the English systems, and the conclusion is there reached, as we insist it must be here reached, that while the law is fully broad enough to include females in its provision, yet that it was not so intended and, therefore, must be limited by judicial construction. Other cases illustrating the same principles and sustaining our position fully, are: *Cirey* v. *Carter,* 48 Ind. 237, 17 Am. Rep. 378; *Bradwell's Case,* 55 Ill. 535; *Bradwell* v. *State,* 16 Wall. 138; *Goodell's Case,* 39 Wis. 282; *Scott* v. *Sandford,* 19 How. 393. The foregoing cases establish fully our first proposition, viz: that the word "citizen," used in section 5 of the organic act, is to be read as if the word "male" was inserted before it. In the case of *Murphy* v. *Ramsey,* 114 U. S. 15, cited by plaintiff in error, it is assumed that the act of the legislature of Utah, conferring the elective franchise on females, is a valid act. That act was not attacked as invalid by the counsel in the case. It would be too much to ask a court, crowded as the Supreme Court of the United States is, to take the point for itself. Even if it had suggested itself to the mind of any member of the court it would not have been his duty to go outside of the case made to decide it. It is the duty of the court to decide the issues made by the parties, for the court ought not to trouble themselves with points in the case which are not put in issue by the parties, unless it be some collateral point in the case that thwarts the decision called for, so as to prevent substantial

justice being done in the case; and then the point should be first suggested to the parties and an opportunity given to investigate and argue it. (Powell on Appellate Proceedings, pp. 23, 32; see, also, *Scott* v. *Sandford,* 19 How. 393, in which the authority of the case of *Legrand* v. *Darnell,* 2 Peters, 664, was denied, because the point there decided was not contested by the parties.) Second, the suffrage act is in conflict with the organic act in other respects. The right of suffrage is not restricted as required by the third clause of section 1860 of the Revised Statutes. There is a proviso in the act of the legislature, in the exact language of said third clause, but that proviso is rendered nugatory by a second proviso which makes the first apply only to persons in the army or navy who were citizens of the territory at the time of their enlistment. Suffrage is conferred on American half-breeds, who have adopted the habits of the whites, but by the organic act it can be conferred only on citizens, etc. It is not enough to make an Indian or half-breed a citizen that he shall have adopted the habits of the whites. He must also have taken up his residence separate and apart from any tribe of Indians. (See organic law published with Sess. Laws of Wash. 1887–8, p. 44.) The original act organizing the territory, by the first proviso to section 5 of that act, limited the right of the territory to confer suffrage on persons who had declared their intention, etc., to such as had "taken an oath to support the constitution of the United States and the provisions of this act." This limitation is not perpetuated in the act of the legislature, but suffrage is conferred on all who have declared their intention, etc., and "shall have taken an oath to support the constitution and government of the United States." This is the language of the Revised Statutes, section 1860, but the revision does not prevail where it is a departure from the original act. An oath to support the government of the United States is not the equivalent of an oath to support the provisions of the organic act. Thus every operative clause of the suffrage act is opposed to the plain provisions of the organic act. Nothing is left.

But if either the first or third objection alone be sustained, it destroys the entire act. If the parts to which those objections are directed be eliminated, the act is left in such an incomplete condition that the courts would not sustain it. (Cooley's Const. Lim. 178–9.)

*J. C. Haines,* as *amicus curiæ,* for Defendants in Error.

Mr. Chief Justice JONES delivered the opinion of the court.

The appellant commenced this action in the District Court for Spokane county, upon the following complaint:

" The above-named plaintiff complains of the above-named defendants, and alleges that the city of Spokane Falls is a municipal corporation, existing as such city under and by virtue of the laws of Washington Territory, and was existing as such city under and by virtue of such laws at the times hereinafter mentioned. That, by an act of the legislative assembly of Washington Territory, approved November 28, 1885, the said city of Spokane is divided into four wards, and all that portion lying west of Howard street and south of Riverside avenue constitutes and is within the fourth ward of said city. . That, under and pursuant to an act of the legislative assembly of Washington Territory, 'An act to amend an act to incorporate the city of Spokane Falls,' approved November 28, 1883, an election was duly held in said city of Spokane Falls, and in each ward thereof, including the said fourth ward thereof, on the first Tuesday, to wit: on the 3d day of April, 1888, for the election, by the qualified voters of said city, of a mayor and other administrative officers, and for the election in each ward respectively, and in said fourth ward, of members of the city council. That the plaintiff is, and at all times herein stated, and on said 3d day of April, 1888, was, a female citizen of the United States, and was on said date more than twenty-one years of age. That she was then, and for more than one year prior thereto had been, a resident, and a citizen, and a qualified elector of the Territory of Washington, and had then, and for more than one month immediately preceding said election, resided within said city of Spokane Falls, and for more than five

days prior to said election within the fourth ward of said city, and was, on said 3d day of April, 1888, a qualified elector in said fourth ward of said city. That the defendants John Todd, J. E. Gandy, and H. A. Clarke were duly constituted and appointed judges of election for said election in and for said fourth ward of said city, and that the said defendants accepted such appointment, and on said 3d day of April, 1888, duly qualified as such judges and entered upon the duty of holding and conducting said election in and for said fourth ward of said city, and did hold and conduct the same. That the plaintiff, on said 3d day of April, 1888, and between the hours of nine o'clock in the forenoon and six o'clock in the afternoon, presented herself at the place appointed for holding said election in said ward and for receiving votes therefor, and where the said defendants as judges of said election were holding and conducting said election, and tendered to said defendants as such judges of election a white paper four inches in width and twelve inches in length, containing the names of the persons for whom she intended and desired to vote at said election for the office of mayor of said city and for other administrative officers thereof and for the office of councilman from said fourth ward, and insisted and demanded of the said defendants as such judges of election that they receive the same as a ballot at said election; but the said defendants, disregarding their duties in the premises, did fraudulently, and maliciously, and without any sufficient cause, and with the intent to injure plaintiff, refuse to receive said ballot then and there tendered to them by the plaintiff, and refused to permit the plaintiff to vote at said election, by which refusal, made fraudulently, and maliciously, and without any sufficient cause, and with intent to injure the plaintiff as aforesaid, the plaintiff was deprived of the right to vote in said ward at said election, to her great ignominy and disgrace, and to her damage in the sum of five thousand dollars. Wherefore, the plaintiff demands judgment against the defendants for the sum of five thousand dollars and for her costs of suit."

To which complaint the appellees demurred, as follows:

"The said defendants demur to the complaint filed in this action, and for cause of demurrer allege that the complaint does not state facts sufficient to constitute a cause of action."

The District Court sustained this demurrer, and judgment was entered thereon, from which judgment this appeal is taken.

In this court the facts are admitted to be as follows: The plaintiff is a woman, and, unless disqualified by reason of her sex, is a qualified elector of the fourth ward of Spokane Falls, and was such on the 3d day of April last. The defendants were the duly appointed and acting judges of election, at an election regularly held on the 3d day of April, 1888, in said city, and fourth ward thereof, for the election of a mayor and other executive officers of said city of Spokane Falls, and for members of the city council of said city, including a member of the council from said fourth ward, on which day an election was held in said city and ward. On said day, and while defendants were acting as such judges of election in said ward, and within the hours prescribed by law for voting therein, the plaintiff presented herself at the place where said election was being held and conducted in said ward by the defendants, and tendered them a printed ballot, in the form prescribed by statute, containing the names of the persons for whom she desired to vote, which the defendants refused to receive, and refused to permit her to vote at such election. This action is brought to recover damages from the defendants for thus wrongfully depriving her of the privilege of voting. The defendants demur, upon the ground that the complaint does not state facts sufficient to constitute a cause of action.

The only point raised by the defendants in the court below was as to the validity of the act of the legislative assembly, approved January 18, 1888, conferring the privilege of suffrage upon women; and it is assumed that no other question will be raised in this court. The correctness of the decision of the District Court on the act of the legislature in question is the only point here to be considered. That act (chap. 51, Laws 1888) reads as follows:

"That all citizens of the United States, male and female, above the age of twenty-one years, and all American half-breeds, male and female, over that age, who have adopted the habits of the whites, and all other inhabitants, male and female, of this territory, above that age, who have declared on oath their intentions to become citizens of the United States at least six months previous to the day of election, and shall have taken an oath to support the constitution and government of the United States at least six months previous to the day of election, and who shall have resided six months in the territory, sixty days in the county, and thirty days in the precinct next preceding the day of election, and none other, shall be entitled to vote at any election in this territory; *and provided,* that no officer, soldier, seaman, mariner, or other person in the army or navy, or attached to troops in the service of the United States, shall be allowed to vote at any election in this territory, by reason of being on service therein, unless said territory is, and has been for a period of six months, his permanent domicile; *provided,* he was a citizen of this territory at the time of his enlistment; *and provided further,* that nothing in this act shall be so construed as to make it lawful for women to serve as jurors."

In the construction of statutes certain rules have obtained, well considered in many cases in different courts and in text-books, so that a court cannot be misled if these rules are followed. Human language being incapable of always accurately expressing the intention of the legislature, recourse is had to the customs and institutions existing at the time of the enactment of a law in order that the actual intention of the legislature may be ascertained. This is not simply interpretation. Interpretation differs from construction in this: that it is used for the purpose of ascertaining the true sense of any form of words; while construction involves the drawing of conclusions regarding subjects that are not always included in the direct expression. In all constitutional governments the powers of government are divided or allotted to different officers or departments, and each of these has

by constitutional limitation certain powers, generally inde-
pendent of each other, and usually involving the duty of in-
terpretation, and often of construction, upon each of the
several departments or officers who have the administration
of the government in charge.     Constitutions have not as a
rule, provided for a tribunal whose specific duty is that of
solving difficult questions which may arise under it prior to
the necessary solution resulting from litigation.     Frequently,
but not always, constitutions provide for the taking the ad-
vice of the judiciary by the legislature prior to the enact-
ment of a law; but in this territory no such duty is devolved
upon the courts, and the construction or interpretation of
statutes is an after-duty devolving upon them.     The execu-
tive department of this territorial government is charged
with this duty often in the interpretation as well as the con-
struction of the powers devolving upon the executive by vir-
tue of the organic act, as well as by the acts of the legisla-
ture.     But, as a rule, the construction and interpretation of
the laws arise after enactment.  To illustrate further, the ad-
ministration of public justice, in this territory, is conferred
upon the courts, and the courts perform that duty by first
ascertaining the facts in any case, and giving effect to their
conclusions of fact by applying the laws to the facts ascer-
tained.     In doing so, a construction or interpretation of law
is necessary.     The right and power of courts to do this is so
universal that their conduct in that regard is unquestioned.
In performing this duty, a court has the aid of a long line of
decisions of other courts which have existed before it; and
their interpretation and construction of similar statutes and
constitutions—many of those courts having superior author-
ity, and the decisions of other courts not having such supe-
rior authority, but of similar jurisdiction, their decisions
being in the same line and on similar questions of construc-
tion and interpretation—have the force of argument and are
of persuasive power.     Other courts, of the same jurisdiction,
resort to them for aid in the interpretation of laws of similar
character.     Where inferior courts construe laws or constitu-
tions, their decisions may be reversed by the court of last

resort, as, in this territory, a decision of this court may be reversed by the Supreme Court of the United States, and its decision become authoritative. In the state courts a long line of decisions upon the same subject-matter continues to be followed, even though the general sense thus given to the words are not satisfactory to the courts of a later date. The doctrine of *stare decisis* is applicable in its full force within the territorial jurisdiction of the courts making such decisions, and this rule is usually followed because it is deemed better to follow that which is already established rather than reopen a question and thereby disturb rights once adjusted. The construction of statutes and constitutions should be uniform and unvarying. They should not be made to mean today one thing, and another thing to-morrow or at any subsequent time. If the interpretation or construction put upon it by the court is unsatisfactory, it is, in this country, in the power of the people to obviate the difficulty by a new constitution, or an amendment thereto, or by changing a statute. It is for this purpose that constitutions are made; that there may be stability in the government which thus furnishes the fundamental law; that varying moods of public opinion, clamors of the populace, or even public sentiment, shall not affect the fundamental law of the land, and thus leave us without any stable and unchanging guide—when the public passions or resentment of the populace might carry the state out upon a sea of revolution, with only passion for a guide. An excited public opinion is quite as likely, indeed history shows more likely, to be in the line of oppression than that of liberty and law; and constitutions, should they change with equal facility, would become alike oppressive and unendurable. It is the duty of a court, in construing a statute, to give effect to the intent of the legislature, even though in doing so a seeming violence is done to some of the words employed. The intent is the law, no matter what form of words is used in expressing that intent. Primarily, this intent is to be found in the words of the law itself, and the presumption attaches that the language used will furnish conclusive expression of that intent; but exam-

ination by the courts often demonstrates the fact that men use words in such manner as would establish a rule directly contrary, or widely at variance, with the intent of the law-making power. While the legislature should be considered to mean what they have said, and leave no room for construction, yet, growing out of the subject-matter and facts existing at the time when the law is made, such intention is not always found in the mere words used. In all cases the entire enactment upon the same subject, or upon others of similar character, should be examined together in order to ascertain the intent of the law-making power. Our ancestors brought with them to the American colonies the common law of England, and that law should be kept in mind in considering the enactments of legislatures or construing clauses in a constitution, as throwing light upon and furnishing great assistance in ascertaining the intent of the makers of the law. The ordinary use of words at the time when used, and the meaning adopted at that time, is usually the best guide for ascertaining legislative intent, as it is always the intent of any written instrument or law at the time it was made that is to govern in enforcing it. It is therefore well to inquire, in all cases, as to the meaning of words, and the force to be given them at the time when they were used, either in written contracts, constitutions, or legislative enactments. And while, as a general thing, it will be taken for granted that when words are used in one place in some legislative enact-ment, or in a contract, they will have a like meaning in every other place in the same instrument, yet this is not always true. Story, in his work on the constitution (vol. 1, sec. 454), lays down a rule, as follows: "It does not follow, either logically or grammatically, that because a word is found in one connection in the constitution, with a definite sense, therefore the same sense is to be adopted in every other connection in which it occurs. This would be to suppose that the framers weighed only the force of single words, as philologists or critics, and not whole clauses and objects, as statesmen and practical reasoners; and yet nothing has been more common than to subject the constitution to this

narrow and mischievous criticism.   Men of ingenious and
subtle minds, who seek for symmetry and harmony in lan-
guage, having found in the constitution a word used in some
sense which falls in with their favorite theory of interpret-
ing it, have made that the standard by which to measure its
use in every other part of the instrumeet.   They have thus
stretched it, as it were, on the bed of Procrustes, lopping off
this meaning when it seemed too large for their purpose,
and extending it when it seemed too short.   They have thus
distorted it to the most unnatural shapes, and crippled, where
they sought only to adjust its proportions according to their
own opinions."   Another rule that obtains in all the courts
is, that when a general power is conferred, or a duty en-
joined, every particular power necessary for the exercise of
the one or performance of the other is also conferred, and
the particular parts must be made to harmonize with the en-
tire purpose.   This is, however, modified by another rule:
that, when the means for the exercise of a granted power are
given, no other or different means can be implied because
more effectual or convenient.

A further source of light in the construction of a statute
or a constitution, aside from the mere examination of
words, and that which is implied, is found in the subject-
matter of which the statute or constitution treats, and the
object to be accomplished, the evil to be remedied, or the
right to be granted, in order that, by grasping the motive
in the same light in which the law-maker saw it, we may the
more readily or thoroughly apprehend his meaning and the
thought he would convey to others, than we would other-
wise be able to do if we simply knew and understood what
the words implied in endeavoring to convey to us that
meaning.   The context often controls the meaning of a word.
or phrase, either by extending or limiting its signification.
A conspicuous example is given in the authority last cited.
In our form of government the national legislature is gov-
erned by a constitution granting to it certain powers, which
are called "enumerated powers," and are, in fact, enumera-
ted in the constitution itself; and any power not specified.

in the constitution specifically, or by necessary implication, does not exist at all. The congress can claim no powers which are not thus granted. This applies not only to the constitution as originally made, but as it now exists, with the amendments. (*Gibbons* v. *Ogden,* 9 Wheat. 187; *U. S.* v. *Cruikshank,* 92 U. S. 542.) The state, on the contrary, by its constitution, takes away or limits legislative power, instead of giving it, as is done by the federal constitution; and, except as limited by the constitution of the state, or of the United States, the state legislature may enact any law they deem for the welfare of the people under their jurisdiction. The organic act of the territory, in this respect, furnishes a constitutional limitation beyond which the legislature of the territory cannot rightfully proceed. Congress created territorial governments, and furnished the rule of conduct by which the government is to exist, and provided the limitations to each branch thereof. Legislation, of course, must not be in conflict with the laws of congress, under and by which it is organized and the power to legislate is granted, and the rules enacted by congress limit the power of the legislature to make laws.

Recurring, now, to the claim here made involving the act of 1888, already cited, we are to inquire what was the intent of congress in the use of the word " citizen " as found in the organic act. (Rev. Stats., sec. 5506; 10 Stats. at Large, 174, sec. 5.) Section 5 reads as follows: "That every white male inhabitant, above the age of twenty-one years, who shall have been a resident of said territory at the time of the passage of this act, and shall possess the qualifications hereinafter prescribed, shall be entitled to vote at the first election, and shall be eligible to any office within said territory; but the qualifications of voters and of holding office at all subsequent elections shall be such as shall be prescribed by the legislative assembly; *provided,* that the right of suffrage and of holding office shall be exercised only by citizens of the United States, above the age of twenty-one years; and those above that age, who have declared on oath their intention to become such, and shall

have taken an oath to support the constitution of the United States and the provisions of this act; *and provided further,* that no officer, soldier, seaman, mariner, or other person in the army or navy of the United States, shall be allowed to vote in said terrritory, by reason of being on service therein, unless said territory is, and has been for the period of six months, his permanent domicile; *provided further,* that no person belonging to the army or navy of the United States shall ever be elected to or hold any civil office or appointment in said territory." The privilege of voting is not a natural right, but a privilege conferred by law. (Cooley's Const. Lim. 752.) It may be limited or enlarged by the legislature within its own constitutional limitation of power. Section 5, above quoted, provided, first, that at the first election held in this territory, every "white male inhabitant, above the age of twenty-one years, who shall have been a resident of the territory at the time of the passage of this act, and shall possess the qualifications hereinafter stated, shall be entitled to vote and hold any office within the territory," and it is manifest that but for this act of congress the right to vote at such election would not have existed at all. It is, therefore, a privilege conferred upon the class named by that act. It is to be noted, also, that it is conferred expressly upon " every white male inhabitant above the age of twenty-one years." Had it been the pleasure of congress, the act might have limited it simply to male inhabitants, or have extended it to persons under twenty-one years of age, and not have limited it to males. The same section provides, further, that the qualification of voters and of office-holders at all subsequent elections shall be such as shall be prescribed by the legislative assembly; "*provided,* that the right of suffrage and of holding office shall be exercised only by citizens of the United States, above the age of twenty-one years, and by those above that age who shall have declared on oath their intention to become such, and shall have taken an oath to support the constitution of the United States and the provisions of this act." These latter provisions in the act of congress might

have been omitted entirely and the privilege of voting remained vested in the "white male inhabitant," without reference to citizenship or other qualification whatever, the words "white male inhabitants" being words of limitation as well as words granting the privilege of suffrage and of holding office. The word "citizen," also contained in the proviso, is also to be construed as a limitation upon the legislative power, and was quite evidently intended to establish a different rule from the words first quoted. The word "citizen" at that time included, as now, all native-born inhabitants of the United States, without regard to sex, and if it had been intended by congress to use the word "citizen," in the broad sense claimed for it, then there would have been no occasion for specifying, as congress did, in the first phrase, "white male inhabitant," if, in the use of the word "citizen" in its place in the proviso it was intended to include females as well as males; the change from "white male inhabitant" to the word "citizen" quite evidently being used for the purpose of excluding aliens, and not for the purpose of enlarging the grant, and there understood with reference to suffrage as applying to male "citizens" alone. The power granted by congress in this section not being intended by the latter phrase to extend the first grant made to the "white male inhabitants," but to limit it to a smaller class of people in this territory; and yet the same fact that the word "citizen" at that time applied to all native-born persons, the same as it now does, was then well understood in a general sense, but was equally well understood as applicable only to male citizens of over twenty-one years of age when used as relating to the granting of the privilege of the elective franchise. That this is true, an examination of the enabling act itself will furnish a criterion upon which judgment may rest. The same proviso which relates to the elective franchise also relates to persons who are entitled to hold office in the territory. The same act provides that every territory shall have the right to send one delegate to congress, and the only limitation is that he shall be a citizen. It will not probably be contended by any

person but that the delegate was intended to be and, indeed, must be a man, and an elector within the territory; and it certainly was not within the intent of congress that a woman should go to the house of representatives as a delegate. The thought was not in the mind of anybody. The act also provides for the election of justices of the peace and other judicial officers. Yet will it be claimed that it was within the contemplation of congress at the time of the passage of this act that these might be filled by women? That at that time it was within the intent of congress that under that act women might be elected to hold those offices? It might have been better, and perhaps would now be a step in advance, if such had been the case; but was that the legislative intent at that time?

If we turn to the constitution of the United States we find that the whole structure of the instrument is based upon the idea present in the minds of the makers of it that the officers provided for therein shall be males. In the first place, and as of minor importance, the form of every word in the constitution relating to the holding of office under that constitution is masculine. It provides that the senate shall be composed of two senators from each state. No person shall be a senator who shall not have reached the age of thirty years. The vice president shall be the president of the senate. No person shall be eligible to the office of president except a native-born citizen, who shall hold his office during the term of four years, and shall be elected as therein provided. The judicial power shall be vested in one supreme court, the judges whereof shall hold their offices during good behavior. In numerous other instances it is conclusively apparent that at the time of the framing of that instrument the idea of a woman holding office under that constitution was as foreign to the mind as that a woman might be president under that constitution; else the sole limitation would not have been that the president should be a native-born citizen of the United States. If the word "citizen," as there used, had been supposed to include females, it will not now be questioned but that there would

have been an express negation in that regard.  Such has been the uniform practical construction ever since its adoption, and for more than thirty years our organic act has likewise been construed to mean "male citizen," when the privilege of voting has been under consideration, and even now it is not disputed but that was the sense in which congress then used the word.

This practical construction is not to be ignored or evaded. As we have before said, the construction of an act of the legislature should be uniform and unvarying in order to protect the liberties of the people, and this is not unfrequently carried out by the consideration of the words used as of the time when they were used, and the practical contemporaneous construction at and succeeding the times when used, forming a part of the act to the same extent as if contained within its specific words.  No other rule can be safely followed.  Words have different significations at different times and in changed circumstances, but in a fundamental law they must always be of the same meaning in the same connection, and it rests with the supreme power to establish a new rule.  The same rule is applicable to other words, and their significance cannot be gainsaid or changed because the opinions of men change with their desires. Ever since the colonial law provided that a person accused of a crime should be tried by a jury of "twelve honest men," the word "jury," standing alone, has meant the same thing.  That there have been here and there exceptions, help to establish the rule, and there can be no doubt in the mind that the word "jury," as found in the national constitution and our own laws, has and can have but the one meaning until competent authority shall in express terms make a different meaning possible.  We are cited, as opposed to the views here expressed, to the case of *Murphy* v. *Ramsey*, 114 U. S. 14, 5 Sup. Ct. Rep. 747.  There were five cases of similar character carried from the Supreme Court of Utah to the Supreme Court of the United States and embraced in the opinion here referred to.  The facts in these cases are carefully set out by Mr. Justice MATTHEWS, and the conten-

tion grew out of the act of congress known as the "Edmunds
Act," whereby a board of commissioners was appointed for
the territory of Utah, growing out of the condition of affairs
there relating to the subject of polygamy in that territory.
This board had extended that act so as to interfere with and
control the action of registration officers and affect the
qualification of voters in that territory.  While it is true
that it appears in that case that under the law of Utah
women possessed the privilege of voting, yet that question
was not argued before the Supreme Court, and was not in any
manner passed upon by that court.  Mr. Justice MATTHEWS,
who delivered the opinion of the court, is careful to say that
on the examination of the ninth section of the act of March
22, 1882, providing for the appointment and prescribing the
duties and powers of that board, it shows that they have no
functions whatever to perform in respect to the qualification
of voters, much less to prescribe any qualification of voters
as a condition of registration.  It is true that the court in
that case consider the questions involved without reference
to the question of the right of females to vote under the laws
of Utah, and place it upon the ground that the board were
powerless in that regard, and therefore we consider that
decision as without force in this regard.  And it appears
therefrom conclusively that the Supreme Court, by that
decision, furnished no ground whatever for the conten-
tion here made that the laws of Utah authorizing woman
suffrage have received the sanction of that court.  The case
of *Minor* v. *Happersett,* 21 Wall. 162, is also cited for the
purpose of showing that the provisions of the fourteenth
amendment to the constitution of the United States, wherein
it is said that all persons born or naturalized in the United
States, and subject to the jurisdiction thereof, are citizens
of the United States and of the state wherein they reside,
are by the words used in affirmance of the construction con-
tended for by appellant.  The decision proceeds upon an
exactly opposite theory, and denies the doctrine contended
for, and therefore it does not follow that the use of the word
"citizen" in the enabling act conveys the idea or carries

with it the proposition that the legislature has the right to confer the privilege of suffrage upon female citizens; nor can it be true, unless it be further contended that at the time of the passage of the organic act of the territory the word "citizen" necessarily implied a female as well as a male citizen, when used as empowering the legislature to grant the privilege of voting to all citizens. While there is no contention that the word "citizen," before and since the adoption of the fourteenth amendment, included women, yet the authority referred to expressly declares that the right of suffrage was not one of the privileges or immunities of citizenship guaranteed by that amendment. (See, also, *Van Valkenburg* v. *Brown,* 43 Cal. 43.) Continuous illness since the argument of this case prevents me from going more at large into the subject than I have already done; but, in view of the considerations herein urged, we are to declare what was the intent of congress by the organic act of the territory in the respect referred to, and to give force to that intent. In construing agreements merely between parties, and even more especially when giving a construction to a statute, the thing which we are to arrive at with as much certainty as we are able is the thought which it was intended to express, and the intent of the power prescribing the rule; and we are to enforce this intent as it existed at the time it was made. In 1852, when this act was passed, the word "citizen" was used as a qualification for voting and holding office, and, in our judgment, the word then meant and still signifies male citizenship, and must be so construed. That the rule contended for might be better, we are not called upon to determine. The congress can confer the desired power upon our legislature, and we cherish the hope that in the near future our own citizens will have an opportunity to determine this question for themselves in the formation of a constitution for the state of Washington.

The judgment of the court below should be affirmed.

LANGFORD, J., and ALLYN, J., concurred.