578 F.Supp. 846 (1983)
AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, et al., Plaintiffs,
v.
STATE OF WASHINGTON, et al., Defendants.
No. C82-465T.
United States District Court, W.D. Washington, at Tacoma.
December 14, 1983.
*847 *848 *849 *850 Winn Newman, Lisa Newell, Washington, D.C., Edward Earl Younglove, III, Olympia, Wash., for plaintiffs.
Richard A. Heath, Clark J. Davis, Chris Gregoire, Olympia, Wash., for defendants.

OPINION AND DECLARATORY JUDGMENT
TANNER, District Judge.

I. STATEMENT OF THE CASE
On September 16, 1981, Plaintiff's filed charges with the Equal Employment Opportunity *851 Commission (EEOC).[1] The EEOC took no action on Plaintiff's charges. On April 31, 1982, the U.S. Department of Justice issued Notices of Right to Sue to Plaintiffs.
On July 20, 1982 two Unions, the American Federation of State, County and Municipal Employees (AFSCME) and the Washington Federation of State Employees (WFSE), on behalf of some 15,500 workers in jobs held primarily by females, filed the complaint initiating this Class Action against the State of Washington. Plaintiffs seek a declaratory judgment and money damages pursuant to Title 28 U.S.C. §§ 2201 and 2202, concerning Defendant's discriminatory implementation and application of its compensation system, and injunctive relief to provide enforcement of a nondiscriminatory compensation system as it previously has been or herein may be judicially determined.
Venue is properly laid in this Court under Title 28 U.S.C. § 1391(b). This Court has jurisdiction in this matter by virtue of Title VII of the Civil Rights Act of 1964, as amended on March 24, 1972, Title 42 U.S.C. § 2000e, et seq., and Title 28 U.S.C. § 1331.
By order of the Court, dated April 1, 1983, this case was bifurcated into two phases (i.e., liability and remedy). By later order of the Court dated November 2, 1983, the remedy phase was bifurcated into two more phases (i.e., injunctive relief and back pay). Pretrial conferences were held prior to each trial to clarify the issues in the case. Unfortunately the parties were never able to agree upon a pretrial order at any phase of this litigation. The Court proceeded to try each phase of the case on two proposed pretrial orders, as submitted by the parties.
In the liability phase, or Stage I of this litigation, both pretrial orders were remarkedly similar in content as to the ultimate issues. The liability phase was tried to the Court commencing August 30, 1983, and continued over a period of eight days, concluding on September 14, 1983, with oral argument by counsel for both parties.
The injunctive relief phase of this litigation was tried to the Court commencing November 14, 1983 and concluding on November 17, 1983, again with oral arguments. Following the Court's determination that injunctive relief was appropriate and would issue herein, the back pay hearing was scheduled for and commenced on November 30, 1983. The back pay hearing, the last phase of this lengthy and complex lawsuit, concluded on December 1, 1983, with the Court's determination that back pay was appropriate and would be so awarded.
Throughout the course of this litigation several witnesses were called by both parties, more than 200 exhibits comprising several thousand pages were offered into evidence, and numerous depositions and affidavits were submitted to the Court. At the conclusion of each phase of the litigation, both parties submitted proposed findings of fact and conclusions of law.
The ultimate objective of this decision is to determine every issue of fact and law presented and thereby finally settle the divisive problems of gender-based discrimination in compensation in the State of Washington.

II. RULINGS ON MAJOR ISSUES

1. Class Certification:

On November 1, 1982, Plaintiffs moved the Court for Class Certification. The Class sought to be certified included male and female employees under the jurisdiction of the Department of Personnel (DOP), and the Higher Education Personnel Board (HEPB), who have worked or do work in positions that are or have ever been 70% or more female. This Court, by order dated *852 March 31, 1983, found that the prerequisites to certification of a Class were satisfied, Fed.R.Civ.P. 23, and the Class above described was certified.
There are seven (7) prerequisites that a Plaintiff seeking to maintain a Class Action must meet, two implicit and five explicit. See Southern Snack Foods v. J & J Snack Foods, 79 F.R.D. 678, 680 (D.N. J.1978). The implicit prerequisites are that a Class exist and the Class representatives be members of that Class. Defendant, State of Washington, argued that the Class definition the Plaintiffs were requesting would create a Class whose membership probably could not be ascertained. It was Defendant's contention that the certified definition should be limited to include only classifications that are currently 70% or more female, thereby excluding employees in jobs which were formerly predominately female but have since been integrated. Plaintiffs responded that employees in job categories which were predominately female during the period covered by this action had suffered the same discrimination as employees in jobs which are still predominately female. Because the employees in the jobs that were both currently 70% or more female and were at one time 70% or more female, were readily identifiable in Defendant's records, the Court found there was no reason why they should be excluded from the Class. There was no question that the Class representatives were members of the Class. Accordingly, this court found that the implicit prerequisites were met.
The explicit prerequisites are that the Plaintiff Class meet all four requirements of Fed.R.Civ.P. 23(a)numerosity, commonality, typicality, and adequacy of representation, and that the Class fulfill the conditions of any one of the three subsections of Fed.R.Civ.P. 23(b). See Davis v. Avco Corporation, 371 F.Supp. 782, 790 (N.D.Ohio 1974); see also Williams v. New Orleans Steamship Association, 341 F.Supp. 613, 617 (E.D.La.1972).
(a) Numerosity: Defendants did not contest certification upon this basis. It was uncontroverted that the numerosity requirement was met.
(b) Commonality: Defendant argued that certification should be denied because of great factual diversity in the individual claims. See Montgomery v. Rumsfeld, 572 F.2d 250 (9th Cir.1978). However, this court found "questions of law or fact common to the Class." Fed. R.Civ.P. 23(a)(2). The alleged existence of a sexually discriminatory compensation policy presents questions of both fact and law, which are common to all employees in all of the predominately female classifications, notwithstanding any differences between the jobs.
(c) Typicality: Defendants did not contest the typicality of the individual Class representatives with regard to Plaintiff's discrimination in compensation claim. Defendant's opposition with respect to the "working out" of Class and other related claims was rendered moot by later rulings of the Court.
(d) Adequacy of Representation: This fourth requirement, which incorporates due process, is imposed for the purpose of protecting absent Class members from the effect of an adverse judgment resulting from representation at trial by parties whose interests are not the same as their own. Defendants contended that the individual Plaintiffs could not adequately represent the interests of the Class so long as they continued to be represented by the Union attorneys because of a potential conflict at the remedy stage of the litigation between the interests of the Class and the interests of the members of the Plaintiff's Union who are not in the Class. In Social Services Union, Local 535 v. County of Santa Clara, 609 F.2d 944, 948 (9th Cir.1979), the Court of Appeals held that "[m]ere speculation as to conflicts that may develop at the remedy stage is insufficient to support denial of initial Class certification." Finding no basis in the record to support Defendant's contention that the Plaintiffs could not protect the interests of the Class which they sought to represent; *853 finding that the Unions herein had, in the past, been responsive to Class interests; and finding that the Unions herein were conducting the lawsuit vigorously, this court held that those seeking to represent the Class had the kind of personal stake in the litigation that would insure adequate representation of the interests of the Class members.
(e) Rule 23(b): Plaintiffs elected to proceed under Fed.R.Civ.P. 23(b)(2).
"... that the party opposing the Class has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole."
Defendants conceded that the Class the Plaintiffs sought to certify met the requirements of subsection (b)(2) of Rule 23, and did not oppose such maintenance of this action.
In summary, having found the Plaintiffs met the seven prerequisites to maintenance of a Class action, this court found this case appropriate for certification under Fed.R.Civ.P. 23.
Subsequent to the litigation of Phase I, (i.e., the liability trial), this Court modified the Class definition in accordance with facts elicited at trial. The Class, as redefined, is as follows:
Male and female employees of all job classifications under the jurisdiction of DOP and HEPB which were 70% or more female as of November 20, 1980[2] or anytime thereafter.

2. Exhaustion of Administrative Remedies:

Plaintiff's EEOC claims and complaint were based on Title VII of the Civil Rights Act of 1964, as amended on March 24, 1972. Title VII requires Plaintiffs to file their claims with the EEOC as a jurisdictional prerequisite to filing suit in District Court. In September of 1981 the individual Plaintiffs[3] in this Class Action each filed claims with the EEOC charging that:
The State of Washington has and is discriminating on grounds of sex in compensation against women employed in State service by establishing and maintaining wage rates or salaries for predominately female job classifications that are less than wage rates or salaries for predominately male job classifications that require equal or less skill, effort, and responsibility.
EEOC charge Number XXXXXXXXX.[4] The Defendant, relying on Ong v. Cleland, 642 F.2d 316 (9th Cir.1981), argued that the Plaintiffs herein filed a charge with the EEOC based on one theory of discrimination and then attempted to sue in Federal Court based on additional theories.
This Court, after a careful review of relevant case law, determined that Defendant's reliance upon Ong was misplaced. The Ong Court held that a Federal court should not permit a complaint to proceed when the "fit" with the administrative charge is so loose that it would "circumvent the Title VII scheme which contemplates agency efforts to secure voluntary compliance before a civil action is instituted." Id. at 319. This Court found that the "fit" between the administrative charge and the judicial allegation was not too loose. The administrative charge and the whole gambit of allegations of discrimination were sufficiently related factually to have put the EEOC on notice of the subsequent judicial allegations.

3. Plaintiff's Claims Based on State Law:

Plaintiff's alleged violations of a number of State provisions, in addition to alleged *854 Title VII violations, as jurisdictional basis for the present action and sought pendent jurisdiction. The State provisions were the Washington State Law Against Discrimination, Wash.Rev.Code § 49.60.010 et seq; the Washington State Equal Pay Law, Wash.Rev.Code § 49.12.175; the State Civil Service Law, Wash.Rev.Code § 41.06.010 et seq; the State Higher Education Personnel Law, Wash.Rev.Code § 28B.16.010 et seq; the Washington State Equal Rights Amendment, Wash.Rev.Code Const. Amendment 61, Article XXXI; and several Governor's Executive Orders. Recognizing the duty of federal courts to avoid needless decisions on issues of State law, United Mineworkers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), this Court exercised its discretion in refusing pendent jurisdiction. In so ruling, this Court weighed carefully the considerations of judicial economy, convenience, and fairness to litigants. Id., 383 U.S. at 726, 86 S.Ct. at 1139. This case is basically a Title VII action, and the Court considered only Title VII issues and cases.

4. Tenth and Eleventh Amendment Claims:

In the 1972 Amendments to Title VII of the Civil Rights Act of 1964, Congress, acting under Section 5 of the Fourteenth Amendment, authorized federal courts to award money damages in favor of private individuals against a State government found to have subjected the complaining individuals to employment discrimination on the basis of sex. See Title 42 U.S.C. § 2000e-5(g) (1970 ed. and Supp. IV), and Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976).
"There is no dispute that in enacting the 1972 Amendments to Title VII to extend coverage to the States as employers, Congress exercised its power under Section 5 of the Fourteenth Amendment. See, e.g., H.R.Rep. No. 92-238, p. 19 (1971); S.Rep. No. 92-415, pp. 10-11 (1971). Cf. National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976)."
Fitzpatrick, 427 U.S. at 453 n. 9, 96 S.Ct. at 2670 n. 9.
Defendant's argument to the contrary is without merit in that its reliance upon the rulings developed in National League of Cities v. Usery; Hodel v. Virginia Surface Mining to Reclam. Ass'n, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981); and EEOC v. Wyoming, ___ U.S. ___, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983), is misplaced.[5]
The Fitzpatrick decision, read in conjunction with Hodel, 452 U.S. at 287, n. 28, 101 S.Ct. at 2366, n. 28, makes it perfectly clear that Congress has power, under Section 5 of the Fourteenth Amendment, to prohibit sex discrimination in employment; that federal courts have authority to formulate appropriate remedies once such discrimination is found; and that such power and authority extends to the State as an employer, the Tenth and Eleventh Amendments notwithstanding.

*855 5. Plaintiff's Sex Segregation Claim:

Throughout their pleadings Plaintiff alleged the Defendant discriminated against the Plaintiff's Class by maintaining historically sex segregated job classifications. At trial, it became apparent that the alleged sex-segregation was not an independent claim, but an element of Plaintiff's claim based on discrimination in compensation. A careful reading of the voluminous pleadings herein reveals the Plaintiff's use of the term "sex-segregation" merely refers to sexual predominance, either male or female, in various job classifications. Plaintiff conceded this interpretation at trial.
This Court determined that sex-segregation was in issue, but only as an element of probative evidence supporting Plaintiff's disparate impact and disparate treatment arguments. Accordingly, Plaintiff's sex-segregation claim was dismissed.

6. Abstention:

Employing the doctrine of Railroad Commission v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), this Court denied Defendant's request that this Court abstain until the State Courts had attempted a resolution of the controversy. As the United States Court of Appeals for the Ninth Circuit recently held, "[t]o determine whether Pullman abstention is appropriate, the district court must apply a three-prong test...."[6]Badham v. U.S. Dist. Ct. For N.D. of Cal., 721 F.2d 1170, 1172 (9th Cir.1983). This Court found that the complaint did not "touch a sensitive area of social policy upon which the federal courts ought not to enter ...." Thus the first prong of the Pullman test was not met.[7]

III. ESTABLISHED BASIC FACTS & LAW
The standards generally applicable to claims of discrimination under Title VII of the Civil Rights Act of 1964, section 701, et seq, Title 42 U.S.C. § 2000e et seq, were first articulated by the United States Supreme Court in Griggs v. Duke Power Company, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (Disparate Impact), and in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (Disparate Treatment). Since then, decisions on this same subject matter have been rendered in that court and other Federal courts in a considerable number to the present time. All of the decisions that appear to have direct or indirect application to the present case have been closely reviewed and analyzed, individually and in relation to each other. Based thereon this Court finds and holds that the following statements are now well established in fact and law.
1. Title 42 U.S.C. sec. 2000e-2(a)(1) and (2) provides:
(a) It shall be an unlawful employment practice for an employer(1)... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individuals ...sex...; or
(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individuals ...sex....
2. The provisions of Title VII do not prohibit Plaintiffs in this case from suing Defendants for sex based wage discrimination, and other discriminatory compensation practices. In County of Washington *856 v. Gunther, the U.S. Supreme Court, addressing this very question, stated:
Title VII's prohibition of discriminatory employment practices was intended to be broadly inclusive, proscribing "not only overt discrimination but also practices that are fair in form, but discriminatory in operation." Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). The structure of Title VII litigation, including presumptions, burdens of proof, and defenses, has been designed to reflect this approach.
County of Washington v. Gunther, 452 U.S. 161, 170, 101 S.Ct. 2242, 2248, 68 L.Ed.2d 751.
3. The plain language and broad remedial policy behind Title VII should not be limited in the absence of a clear congressional directive. "As Congress itself has indicated, a `broad approach' to the definition of equal employment opportunity is essential to overcoming and undoing the effect of discrimination. S.Rep. No. 867, 88th Cong., 2d Sess., 12 (1964). We must therefore avoid interpretations of Title VII that deprive victims of discrimination of a remedy, without clear congressional mandate." County of Washington v. Gunther, 452 U.S. at 178, 101 S.Ct. at 2252.
4. The four affirmative defenses of the Equal Pay Act are available to Defendants in a sex-based wage discrimination case brought under Title VII. See, e.g., County of Washington v. Gunther, 452 U.S. at 176, 101 S.Ct. at 2251. Only the fourth affirmative defense"payment made pursuant to ... (iv) a differential based on any factor other than sex," Title 29 U.S.C. § 206(d)(1)(iv)is relevant to this case.
5. In Los Angeles Dept. of Water and Power v. Manhart, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), the Supreme Court addressed and dismissed the applicability of a cost-justification defense in Title VII cases by explicitly stating," ... neither congress nor the Courts have recognized such a defense under Title VII." Id., 435 U.S. at 717, 98 S.Ct. at 1379-1380.
This Court is cognizant of the relevance of cost in determining the propriety of back pay under the rationale articulated in the Manhart and Norris[8] decisions. The relevance of cost at that juncture of a case is clearly distinguishable from the application of a cost-justification defense at the liability phase of Title VII litigation.
6. Title VII prohibits two types of employment discrimination. First, it prohibits disparate treatment: intentional, unfavorable treatment of employees based on impermissible criteria. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See also Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); International Brotherhood of Teamsters v. U.S., 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Second, it prohibits practices with a discriminatory impact: facially neutral practices that have a discriminatory impact and are not justified by business necessity. Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158. See also Teamsters, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396. The same set of facts may give rise to a claim under both disparate impact and disparate treatment theories. Teamsters, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15; Bonilla v. Oakland Scavenger Company, 697 F.2d 1297 (9th Cir.1982); Heagney v. University of Washington, 642 F.2d 1157 (9th Cir.1981).
7. Until recently, the availability of the disparate impact analysis in section 703(a)(1) cases, was unclear. However, the Ninth Circuit in Wambheim v. J.C. Penney Company, Inc., 705 F.2d 1492, 1493-1494 (9th Cir.1983) (per curiam), held that the disparate impact analysis is appropriate in Section 703(a)(1) cases. See also Bonilla v. *857 Oakland Scavenger Company, 697 F.2d 1297, 1302-04 (9th Cir.1982), petition for cert. filed, 51 U.S. Law Week 3775 (U.S. April 15, 1983), (No. 82-1699). The applicability of the disparate impact analysis in Section 703(a)(2) cases is well established. See Griggs, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158.
8. Establishment of a prima facie case under the disparate impact theory requires Plaintiff to show, by a preponderance of the evidence, that the challenged practice has a significantly discriminatory impact. Connecticut v. Teal, 457 U.S. 440, 102 S.Ct. 2525, 2531, 73 L.Ed.2d 130 (1982). It is not necessary to establish discriminatory intent. Griggs, 401 U.S. at 432, 91 S.Ct. at 854.
A prima facie showing shifts to Defendant the burden of justifying its policy. As articulated by the Ninth Circuit Court of Appeals in Wambheim v. J.C. Penney Company, Inc.,
[t]he standard applied in section 703(a)(2) cases is business necessity, see Griggs, 401 U.S. at 431, 91 S.Ct. at 853, manifest relationship to the employment, see Connecticut v. Teal, 102 S.Ct. at 2531, or necessity for the efficient operation of the business. See Peters v. Lieuallen, 693 F.2d 966, 969 (9th Cir.1982). Because none of these measures is particularly applicable to the section 703(a)(1) employment (compensation) case, we adopt the standard articulated in Bonilla: (Defendant) must "demonstrate that legitimate and overriding business considerations provide justification." Bonilla, 697 F.2d at 1303.
Wambheim, at 1495.
In assessing the viability of the Defendants business justifications in a section 703(a)(1) case, this court is obliged to balance said considerations against the countervailing national interest in eliminating employment discrimination. See Bonilla, 697 F.2d at 1303, quoting Griggs, 401 U.S. at 430, 91 S.Ct. at 853. Only if Defendant's business justification overrides this national interest will the defense be considered sufficient. The Supreme Court has admonished that under Title VII, "practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to freeze the status quo of prior discriminatory employment practices." Griggs, 401 U.S. at 430, 91 S.Ct. at 853.
Assuming Defendant's could carry the burden of justifying its compensation system, the Plaintiff's could still prevail by showing that the practice was used as a pretext for discrimination. Connecticut v. Teal, 102 S.Ct. at 2531; Wambheim, at 1494. Evidence that the defense was a pretext might include proof of past intentional discrimination, or proof that an alternative practice would serve the Defendant's legitimate interests with less disparate impact. Id. at 1494; see also Contreras v. City of Los Angeles, 656 F.2d 1267 (9th Cir.1981).
9. The United States Supreme Court in Texas Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), articulated the basic allocations of burdens and order of presentation of proof in a Title VII case alleging disparate treatment.
First, the Plaintiff has the burden of proving by the preponderance of the evidence, a prima facie case of discrimination. Second, if the Plaintiff succeeds in proving the prima facie case, the burden shifts to the Defendant, "to articulate some legitimate, non-discriminatory reason for the employees rejection". McDonnell Douglas, [411 U.S.] at 802 [93 S.Ct. at 1824]. Third, should the Defendant carry this burden, the Plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the Defendant were not its true reasons, but were a pretext for discrimination.
Burdine, 450 U.S. at 252-53, 101 S.Ct. at 1093. The Burdine court further defined the nature of the burdens in a disparate treatment case. In the first instance, the Plaintiff has the burden of establishing a prima facie case of disparate treatment. *858 This burden is not onerous. Id, at 253, 101 S.Ct. at 1093. Establishment of a prima facie case under a disparate treatment theory requires Plaintiff to show facts supporting an inference of intent to discriminate. "... It is settled that a prima facie showing of disparate treatment may be made without any direct proof of discriminatory motivation." Gay v. Waiters Dairy Lunchmen's Union, 694 F.2d 531, 546 (9th Cir.1982). A Plaintiff may make such a showing with a combination of direct, circumstantial and statistical evidence of discrimination. It is now well settled that proof of the four McDonnell Douglas criteria is not the only way to establish a prima facie case of disparate treatment, and that the McDonnell Douglas approach is to be applied flexibly. See Gay v. Waiters Dairy Lunchmen's Union, 694 F.2d at 550.
... the best prima facie case utilizing statistical date, one allowing the strongest inference of intentional discrimination outside of the McDonnell Douglas framework, is that in which the Plaintiff's statistical proof is "bolstered" by other circumstantial evidence of discrimination bringing "the cold numbers convincingly to life." Teamsters, supra, 431 U.S. at 339, 97 S.Ct. at 1856.
Gay, 694 F.2d at 553.
Circumstantial evidence which courts have found probative of intentional discrimination, includes the following: the historical context out of which the challenged practices arise; obstacles confronting applicants and/or employees; subjective employment practices utilized by the Defendant resulting in a pattern disfavoring females; the foreseeable adverse impact of those practices; the increase in pay to the Plaintiffs since filing of the instant suit; discriminatory treatment in other areas of employment; and, perhaps most telling, recognition of disparate treatment by responsible State officials. The Burdine Court explained that the "prima facie case" raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." Burdine, 450 U.S. at 254, 101 S.Ct. at 1094, quoting Furnco Construction Company v. Waters, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). The Burdine Court went on to explain:
Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the Plaintiff's evidence, and if the employer is silent in the face of the presumption, the Court must enter Judgment for the Plaintiff because no issue of fact remains in the case.
Burdine, 450 U.S. at 254, 101 S.Ct. at 1094.
The burden that shifts to the Defendant is to rebut the presumption of discrimination raised by Plaintiff's evidence, by producing evidence that Defendant's actions (in the instant case, Defendant's mode of compensation) were legitimate and non-discriminatory. The Burdine Court stated
The Defendant need not persuade the Court that it was actually motivated by the proffered reason. See Sweeney, supra, [439 U.S.] at 25 [99 S.Ct. at 296]. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. (footnote omitted).... The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, (footnote omitted) and the factual inquiry proceeds to a new level of specificity. Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions. *859 Id, at 254-256, 101 S.Ct. at 1094-1095. It is critical to note that the burden of persuasion never shifts from the Plaintiff to the Defendant. Id., at 253, 101 S.Ct. at 1093.
All that shifts to the Defendant is the burden of production. Identifying this burden as an "intermediate burden," the Burdine Court emphasized that "the employer need only to produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Id, at 257, 101 S.Ct. at 1096. Limiting the Defendant's evidentiary obligation to a burden of production will not hinder the Plaintiff in that Defendant's explanation of its legitimate reasons must first, rebut the inference of discrimination arising from the prima facie case and, second, afford Plaintiff a full and fair opportunity to demonstrate pretext. Id, at 258, 101 S.Ct. at 1096.
The presentation of proof then shifts back to the Plaintiff to demonstrate that Defendant's proffered reason was not the true reason for the employment decision.
This burden now merges with the ultimate burden of persuading the Court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the Court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. See McDonnell Douglas, supra, [411 U.S.] at 804-805 [93 S.Ct. at 1825-1826].
Burdine at 256, 101 S.Ct. at 1095. Although the Plaintiff's prima facie case will have been rebutted before a Court considers this third and final stage in the presentation of proof, the
evidence (produced by Plaintiff at the prima facie stage) and inferences properly drawn therefrom, may be considered by the trier of the fact on the issue of whether the defendant's explanation is pretextual. Indeed, there may be some cases where the palintiff's [sic.] initial evidence combined with effective cross examination of the defendant, will suffice to discredit the defendant's expalnation [sic.].
Id, at 255, n. 10, 101 S.Ct. at 1095, n. 10. The Ninth Circuit recently instructed, "[a]t the close of the evidence, rather than focusing on the prima facie case, the district court should proceed directly to the ultimate factual issue of whether the Defendant intentionally discriminated against Plaintiff on the basis of (sex)." Wall v. National R.R. Passenger Corp., 718 F.2d 906, 909 (9th Cir.1983).
10. Federal District Courts have jurisdiction under Title VII to fashion an appropriate remedy following a finding of unlawful discrimination.
If the Court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the Court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate....
Title 42 U.S.C. § 2000e-5(g).

IV. FINDINGS OF FACT AND CONCLUSIONS OF LAW
All of the evidence and supporting documents have been meticulously examined. Many of the proposed Findings and Conclusions were modified, some not included, and others developed by the Court. All were systematically checked against the record. The Court has also read the cases cited by either party as possible authority concerning any issue in the case. Based upon a complete and exhaustive examination of the controlling law, briefs and arguments of counsel, and upon a preponderance of the evidence found credible and the reasonable inferences drawn therefrom, the Court now makes the following:

A. FINDINGS OF FACT
1. Plaintiff's include all male and female employees of all job classifications under the jurisdiction of DOP and HEPB *860 which were 70% or more female as of November 20, 1980, or anytime thereafter.
2. Defendants include the State of Washington, its agencies and institutions, its legislature, and individuals in their official capacities for the State of Washington. (Defendant's PFF # 1).
3. The Plaintiff's filed timely charges with the EEOC on September 16, 1981. The EEOC took no action on Plaintiff's charges. On April 23, 1982, the United States Department of Justice issued Notices of Right to Sue to Plaintiffs. Plaintiffs filed their complaint herein on July 20, 1982.
4. The State of Washington operates two Civil Service systems. The Higher Education Personnel Board (HEPB) has jurisdiction over all classified employees at the institutions of higher education pursuant to Wash.Rev.Code § 28B.16. The State Personnel Board (SPB), and Department of Personnel (DOP) have jurisdiction over all classified employees at the State agencies pursuant to Wash.Rev.Code § 41.06.
5. There are approximately 45,000 classified personnel within these two systems. Plaintiff's Class is constituted entirely from these classified employees. (Defendant's PFF # II, p. 1).
6. In May 1971, then Governor Daniel J. Evans signed into law an amendment to the State Law against discrimination prohibiting employment discrimination based on sex. The amendment became law in July 1971. (Plaintiff's Exhibit 33 in Opposition to Defendant's Motion for Summary Judgment).
7. Prior to July 1971, discriminatory acts were prohibited only on the basis of age, race, creed, color, or National origin. Sex was not considered a factor for which discrimination could be charged.
8. In a memorandum of December 17, 1971, to Agency Representatives, Leonard Nord, Director of Department Personnel of the State said, "... This new amendment is broad in its impact and its passage by the legislature emphasizes not only a change in attitudes about the traditional roles of men and women but also recognizes the needs and realities of this age." (Id.)
9. The record is replete with contemporary letters, memorandums and reports, such as Leonard Nord's above noted memo of December 17, 1971. To this Court they indicate an administrative history that reflects knowledge by Defendant of sex discrimination in State employment since no later than March 24, 1972.
10. As early as the 1950's and as late as 1973, the Defendant deliberately ran help wanted ads in the "male" and "female" columns of newspapers throughout the State. (Plaintiff's Exhibit # 153). Plaintiffs offered no evidence that sex was a bona fide occupational qualification for the jobs advertised or that they were not responsible for the placement of these segregated classified ads.
11. Employer actions, such as use of segregated classified ads, have the expected effect of creating and perpetuating a segregated workforce. (Testimony of Eleanor Holmes Norton).
12. By letter of November 20, 1973, to then Governor Daniel J. Evans, of the State of Washington, Norm Schut, then Executive Director of the Washington Federation of State Employees, stated that "... the Boards have perpetuated the discrimination against women in salary setting that permeates through the private sector and other governmental units." (Plaintiff's Exhibit # 41C). Governor Evans responded by letter of November 28, 1973, directed to Douglas Sayan, Director of HEPB, and Leonard Nord, Director of DOP, stating in part that, "... If the State's salary schedules reflect a bias in wages paid to women compared to those of men, then we must move to reverse this inequity." (Plaintiff's Exhibit # 41D).
13. The two Boards conducted a joint study, and on January 8, 1974 the Directors of the Boards issued the results of their study. Their conclusions include: "There are clear indications of pay differences between classes predominately held by men and those predominately held by women within the State systems. Such differences *861 are not due solely to job `worth'. Further study is necessary to accurately determine the amount of salary differences and all classes to which a `correction' would apply." (Plaintiff's Exhibit # 2).
14. Pursuant to the recommendations of both Boards, Governor Evans contracted for an outside, independent comprehensive study of State government salaries to look into reports of discriminatory pay scales. The consulting firm of Norman Willis & Associates was recommended by the Director of the Department of Personnel and retained to perform the study. The concern of the Evans administration throughout this period of time was the "elimination of all forms of discrimination." (Plaintiff's Exhibit # 41K & L).
15. The purpose of the 1974 Willis study was to "examine and identify salary differences that may pertain to job classes predominately filled by men compared to job classes predominately filled by women, based on job worth. Alternative suggestions to correct disparities were to be provided." (Joint Exhibit # 2, p. 1). The 1974 study examined 59 predominately male classifications and 62 predominately female classifications. The jobs to be examined were selected by representatives of the two personnel boards. "Predominately" was defined as 70% one sex or the other. The 70% cut-off was determined by the State's representatives. An evaluation committee was established, consisting primarily of representatives of State agencies and institutions. Evaluations of each classification were arrived at by consensus. (Joint Exhibit # 2, Testimony of Norman Willis).
16. The 1974 Willis report stated that: The conclusion can be drawn that, based on the measured job content of the 121 classifications evaluated as a part of this project, the tendency is for women's classes to be paid less than men's classes, for comparable job worth ... Overall, considering both systems together, the disparity is approximately 20 percent.
(Joint Exhibit # 2, p. 20).
17. The 1974 report also found that the degree of discrimination increased as the job value increased. For jobs evaluated at 100 points, men's pay was 125% of women's pay. For jobs evaluated at 450 points, men's pay was 135% of women's pay. (Id., p. 13).
18. In December 1974, Governor Evans held a press conference, at which time he stated:
We found that there is, indeed, a general relationship which results in an average of about twenty percent less for women than for males doing equivalent jobs ... I think that steps ought to be taken to rectify the imbalance which does exist ... There are two basic lines. One follows the practice for those positions filled primarily by males. The other by women. You can see the disparity which does exist...
(Plaintiff's Exhibit # 41-0)
19. By memorandum of April 9, 1975, Directors Nord and Sayan provided an update to the Willis comparable worth study. The update computed the cost of eliminating discrimination by increasing the salary for all classifications with a given number of points to the average salary of the male classification with that number of job evaluation points. The update showed that the cost of equalizing salaries for jobs with the same number of points would be approximately 10 times as much for predominately female jobs as for predominately male jobs. (Plaintiff's Exhibit # 5, Testimony of Leonard Nord).
20. In 1976, Willis & Associates were retained by the Defendants to do an update of the 1974 wage discrimination study. The express purpose of the study, pursuant to a decision by Governor Evans, was to "establish a program leading to implementation of the comparable worth study completed in September 1974." (Plaintiff's Exhibit # 3, p. 1).
21. The update also evaluated 85 additional classifications and developed a formula for computing comparable worth rates of compensation based on a comparable *862 worth salary line. The State continues to employ the methodology developed by Willis. (Joint Exhibit # 3, Testimony of Norman Willis).
22. This methodology purports to value each employment classification on the basis of four factors: knowledge and skills, mental demands, accountability and working conditions. The total of the value of these four components constituted the final point value for the Class. (Joint Exhibit # 4).
23. In December 1976, just prior to completing his third term, Governor Evans included a $7 million budget appropriation to begin implementation of comparable worth. (Plaintiff's Exhibit # 41 BB). The same month, the State Personnel Board adopted a resolution stating that:
... the Board supports the correction of disparities identified by the study and that salaries will be based on prevailing rates except where such criteria do not adequately compensate the employee based on the concept of comparable worth.
(Plaintiff's Exhibit # 41 AA).
24. Governor Dixy Lee Ray became the successor to Governor Evans in 1977. She took the appropriation out of the budget even though there was a surplus in the 1976-77 State budget that could have been used to pay Plaintiff's their evaluated worth. (Testimony of Joseph Taller).
25. In her Message to the Legislature of January 15, 1980, Governor Dixy Lee Ray said, "... That survey revealed an average salary difference of 20 percent, favoring men over women for work of similar complexity and value. Because of the cost of bringing women's salaries up to men's, the only thing that we ... and I include the Governor with the Legislature in this ... have done about that 1974 study, was to have it up-dated [sic]. The update revealed that since salary increases have been established on a percentage basis, the inequality gap between men's and women's salaries for similar work has now increased. The dollar cost of solution will be high; it probably cannot be achieved in one action. But, the cost of perpetuating unfairness, within State government itself, is too great to put off any longer...." (Plaintiff's Exhibit # 186, p. 7).
26. In 1977, the State legislature amended the State compensation statutes to provide that, in conjunction with the salary survey findings, HEPB and DOP should furnish the Governor and the Director of Financial Management with supplementary data indicating differentiation in compensation for jobs of comparable worth. The amendment provided that "[a]dditional compensation needed to eliminate such salary dissimilarities shall not be included in the basic salary schedule but shall be maintained as a separate salary schedule for the purposes of full disclosure and visibility." Wash.Rev.Code §§ 41.06.160(5) and 28B.16.110. (Joint Exhibit 6A).
27. HEPB and DOP have each submitted supplemental salary schedules since 1977.
28. Plaintiff's case does not require this Court to make its own subjective assessment as to "comparable worth" as to the jobs at issue in this case.
29. "Comparable Worth", as defined by the Defendant, means the provision of similar salaries for positions that require or impose similar responsibilities, judgments, knowledge, skills, and working conditions. (SSB 3248, Defendant's Exhibit AAAA).
30. In 1983, subsequent to filing of the instant suit, the State legislature passed two comparable worth implementation bills: Substitute Senate Bill 3248 (SSB 3248) and Engrossed House Bill 1079 (EHB 1079). EHB 1079 appropriated $1.5 million to increase the salaries by $100.00 a year of occupants of job classifications for which the current salary range is more than 8 ranges (20%) below the comparable worth range, as shown by the 1982 supplementary salary schedule. The salary increase is not payable until July 1984. (Defendant's PTO # 2; 1983 Wash.Laws, 1st Ex.Sess., Ch. 75 and Ch. 76 § 135).
31. SSB 3248 calls for implementation of salary changes necessary to achieve comparable worth in compliance with the *863 findings of the DOP and HEPB supplemental surveys, and provides that such implementation "shall be fully achieved not later than June 30, 1993."
32. The total number of job classifications that have been evaluated as of 1982 is 284. There are other classifications that are included in Plaintiff's Class Action which have not been evaluated at this time.
33. There are approximately 15,500 employees who are included within the Plaintiff's Class Action. All of the individual Plaintiffs within the Class have not been identified at this time.
34. In addition to testimony and documentary evidence Plaintiffs submitted general statistical data, prepared over a period of years by Defendant, tending to show a general pattern of discrimination by the Defendant against women. This data, when considered together with substantial other non-statistical evidence, provides evidence of a pattern of sex discrimination in employment by the Defendant.
35. The State did not pay, and has not paid, predominately female jobs the full evaluated worth of their jobs as established by the State's own job evaluation studies.
36. The wage system in the State of Washington has a disparate impact on predominately female job classifications. Several comparable worth studies, since 1974, found a 20% disparity in salary between predominately male and predominately female jobs which require an equivalent or lesser composite of skill, effort, responsibility and working conditions as reflected by an equal number of job evaluation points. (Joint Exhibit # 4). There is a significant inverse correlation between the percentage of women in a classification and the salary for that position. (Testimony of Dr. Stephen Michelson).
37. Defendant failed to produce credible, admissible evidence demonstrating a legitimate and overriding business justification. What evidence Defendant did introduce did not rebut the Plaintiff's prima facie showing of disparate impact nor did Defendant's evidence outweigh the countervailing national interest in eliminating employment discrimination.
38. Implementation and perpetuation of the present wage system in the State of Washington results in intentional, unfavorable treatment of employees in predominately female job classifications. Credible, admissible, statistical evidence, bolstered by relevant circumstantial evidence, supports this finding of disparate treatment.
39. Evidence which, when considered as whole shows discriminatory intent, includes the historical context out of which the challenged failure-to-pay arose (FF # 10, supra, fn. 11, infra); obstacles that confronted employees in the predominately female job classifications and subjective employment practices utilized by the Defendant resulting in a pattern disfavoring those employees (FF # 11, supra); the foreseeable adverse impact of those practices (FF's # 12, 16, 18, 25, supra); the proposed increase in pay to the Plaintiff's since filing of the instant suit (FF # 30, supra); and recognition of disparate treatment by responsible State officials (FF's # 12, 16, 18, 25, supra).
40. Defendant failed to produce credible, admissible evidence raising a genuine issue of fact as to whether it discriminated against the Plaintiffs herein. What evidence Defendant did introduce did not rebut the Plaintiff's prima facie showing of disparate treatment, nor did Defendant's evidence frame the factual issue with sufficient clarity so that the Plaintiff would have a full and fair opportunity to demonstrate pretext.
41. All job classifications which were 70% or more female as of November 20, 1980, or anytime thereafter, are within the Class definition and all employees currently in those classifications are entitled to a remedy.
42. Defendant presented evidence in support of its opposition to remedy. Specifically, that evidence was as follows:
a. that there is unemployment and a recession in the State of Washington. (Defendant's PFF Nos. 20-24).

*864 b. that because of the depressed economy State revenues are diminished. (Testimony of Mr. Joseph Taller; Exhibits JJ, KK, LL).
c. that other demands on the State treasury prevent full and complete implementation of comparable worth. (Defendant PFF Nos. 16-19).
d. that Art. 8, § 4 of the Washington State Constitution prohibits deficit spending. (Defendant PFF # 12).
e. that the cost of full and complete implementation of comparable worth salary increases would be prohibitive. (Testimony of Joseph Taller).
f. that full and complete implementation of comparable worth would be disruptive of State government. (Testimony of Joseph Taller).
43. Defendants have failed to present evidence that would tend to show good faith, in failing to pay Plaintiffs their evaluated worth. (Plaintiff's Exhibit Nos. 2, 110, 186).
Insofar as any of the preceding Findings of Fact constitute Conclusions of Law, they are hereby adopted as such.

B. CONCLUSIONS OF LAW
1. This Court has jurisdiction in this matter under Title 28 U.S.C. § 1331 and Title 42 U.S.C. § 2000e et seq.
2. Venue is properly laid in this Court under Title 28 U.S.C. § 1391(b).
3. Declaratory Judgment is properly sought by Plaintiffs pursuant to Title 28 U.S.C. §§ 2201 and 2202, and this Court may grant such relief.
4. Pendent jurisdiction with regard to the Plaintiff's Claims based on State Law is denied as a matter of judicial discretion.
5. Plaintiff's claims, based on sex-segregation, are dismissed.
6. The evidence is overwhelming that there has been historical discrimination against women in employment in the State of Washington, and that discrimination has been, and is manifested by direct, overt and institutionalized discrimination.
7. Sexual discrimination existed in State employment prior to and continued after the 1972 Amendment to Title VII, and is continuing at the present time.
8. Plaintiffs can establish a prima facie case of sexual discrimination in employment under either the theory of disparate impact or disparate treatment.
9. Under the disparate impact theory, the objective facially neutral practice is Defendant's system of compensation.
10. The Defendant's system of compensation has a disparate impact upon employees in predominately female job classifications in violation of Title VII of the Civil Rights Act of 1964, as amended March 24, 1972, Title 42 U.S.C. § 2000e, et seq.
11. The Defendant has failed to demonstrate a legitimate and overriding business consideration justifying discrimination.
12. The Defendant's implementation and perpetuation of the present system of compensation is intentional and results in unfavorable treatment of employees in predominately female job classifications in violation of Title VII of the Civil Rights Act of 1964, as amended March 24, 1972, Title 42 U.S.C. § 2000e, et seq.
13. Discriminatory intent is established by (a) the deliberate perpetuation of an approximate 20% disparity in salaries between predominately male and predominately female job classifications with the same number of job evaluation points; (b) other statistical evidence including the inverse correlation between the percentage of women in a classification and the salary for the classification; (c) application of subjective standards which have a disparate impact on predominately female jobs; (d) admissions by present and former State officials that wages paid to employees in predominately female jobs are discriminatory; and, (e) the Defendant's failure to pay the Plaintiffs their evaluated worth as established by the Defendants.
14. The Defendant has failed to rebut Plaintiff's showing of disparate treatment, *865 or to establish any of the available affirmative defenses which apply to this case.
15. The Plaintiffs have met their burden of proof to show that back pay and injunctive relief is necessary to make whole the victims of discrimination and to prevent perpetuation of the Defendant's discriminatory system of compensation.
16. The Tenth Amendment to the United States Constitution is not a bar to an award of back pay or injunctive relief in a Title VII employment discrimination case against a public employer.
17. The cost of correcting sex-based wage discrimination is not a defense to an award of back pay and injunctive relief.
18. Disruption resulting from action required to correct the sex-based wage discrimination is not a defense to an award of back pay and injunctive relief.
19. Chapter 75 (SSB 3248) and Chapter 76, § 135 (EHB 1079), 1st Ex. Sess., Wash.Laws 1983, do not provide an adequate remedy for the discrimination found by the court because they provide no specific plans for relief, allow discrimination to continue for ten years, and are not otherwise binding upon the Defendant.
20. Defendants have not produced evidence of good faith in failing to pay Plaintiffs their evaluated worth.
21. Plaintiffs are entitled to Declaratory Judgment.
22. Plaintiffs are entitled to injunctive relief against the continuation and repetition of the acts or conduct declared by these Conclusions of Law to be in violation of Plaintiff's rights under Title VII.
23. All individual Class members are entitled to back pay for work performed within the confines of the Class definition at any time since September 16, 1979.
24. Defendant has not evaluated all of the job classifications that involve Plaintiff's Class herein.
25. The individual members of Plaintiff's Class, who are entitled to back pay, have not been identified at this time.
26. Defendant should evaluate all relevant job classifications and identify all persons entitled to back pay.
27. This Court should retain continuing jurisdiction of this case to grant such further relief as may be found by the Court to be appropriate, and to assure compliance with the Declaratory Judgment and Decree entered herein.

DECISION
This is a case of first impression insofar as it concerns the implementation of a comparable worth compensation system. However, it is more accurately characterized as a straightforward "failure to pay" case, remarkedly analogous to the recently decided County of Washington v. Gunther case. The Plaintiffs herein are challenging the State of Washington's failure to rectify an acknowledged disparity in pay between predominately female and predominately male job classifications by compensating the predominately female job employees in accordance with their evaluated worth, as determined by the State.[9]
*866 The threshold question presented to this court is whether Defendant's failure to pay the Plaintiff's their evaluated worth, under the provisions of Defendant's comparable worth studies,[10] constitutes discrimination in violation of the provisions of Title VII. The central focus of the inquiry, in a case such as this, is always whether the employer is treating "... some people less favorably than others because of their race, color, religion, sex or national origin." International Brotherhood of Teamsters v. U.S., 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15. See also Furnco Construction Company v. Waters, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). It is now a well established legal principle that "... practices, procedures or tests neutral on their face, and even neutral in terms of intent cannot be maintained if they operate to freeze the status quo of prior discriminatory employment practices." Griggs v. Duke Power Co., 401 U.S. at 430, 91 S.Ct. at 853.
The record in this case shows, by a preponderance of the evidence, that the State of Washington historically engaged in employment discrimination on the basis of sex;[11] that the discriminatory practices continued after the March 24, 1972 amendment to Title VII;[12] and that the discriminatory practices are continuing at the present time.[13] In fact, there is no credible evidence in the record that would support a finding that the State's practices and procedures were based on any factor other than sex.
In response to at least four (4) years of dialogue among senior State officials, including the then Governor of the State of Washington, Dan Evans, the Washington State Legislature passed legislation, subsequently codified as Wash.Rev.Code §§ 41.06.160(5) and 28B.16.110. This legislation instructed the DOP and the HEPB to furnish a supplemental comparable worth salary schedule in addition to the recommended salary schedule. This legislation was adopted for the express purpose of providing the legislature with the specific dollars and cents involved in eradicating the previously identified and ongoing disparity in pay between predominately male and predominately female job classifications. All arguments to the contrary were just that, arguments. There was no credible, admissible evidence controverting this conclusion. In 1978, 1980, and again in 1982, the legislature had before it the comparable worth salary schedules. It was not until *867 1983, after the filing of the instant lawsuit, that the legislature took affirmative action to implement the comparable worth scheme,[14] and even then, the implementation effort was nothing more than a token appropriation of $1.5 million (none of which has been paid at the present time) and a ten (10) year remedial plan.
After careful review of the record herein, this Court cannot reach any conclusion other than the State of Washington has, and is continuing to maintain a compensation system which discriminates on the basis of sex. The State of Washington, has failed to rectify an acknowledged discriminatory disparity in compensation. The State has, and is continuing to treat some employees less favorably than others because of their sex, and this treatment is intentional.
The court's finding of discrimination based on the theories of disparate impact, and disparate treatment, requires formulation of a remedy. However, Title VII is not "automatic" as to remedy. A court that finds unlawful discrimination "... may enjoin the [discrimination] ... and order such affirmative action as may be appropriate, ... with or without back pay ... or any other equitable relief as the court deems appropriate." Title 42 U.S.C. § 2000e-5(g) (1970 ed., Supp. IV). Because each case should be meticulously considered in determining the appropriate remedy, the choice of remedy is left to the discretion of the district courts. "However, such discretionary choices are not left to a court's `inclination, but to its judgment; and its judgment is to be guided by sound legal principles.' United States v. Burr, 25 F.Cas. No. 14, 69 2d, pp. 30, 35 (CC Va.1807) (Marshall, C.J.)." Albemarle Paper Company v. Moody, 422 U.S. 405, 416, 95 S.Ct. 2362, 2371, 45 L.Ed.2d 280 (1975). Equitable remedies fashioned by the court may be flexible, but they still must be founded on principle. "Important national goals would be frustrated by a regime of discretion that `produce[d] different results for breaches of duty in situations that cannot be differentiated in policy.' Moragne v. States Marine Lines, 398 U.S. 375, 405, 90 S.Ct. 1772, 1790, 26 L.Ed.2d 339 (1970)." Albemarle, 422 U.S. at 417, 95 S.Ct. at 2371.
The Albemarle court went on to state,
The District Court's decision must therefore be measured against the purposes which inform Title VII. As the Court observed in Griggs v. Duke Power Co., 401 U.S., at 429-430, 91 S.Ct., at 853, the primary objective was a prophylactic one:
"It was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees."
Albemarle, 422 U.S. at 417, 95 S.Ct. at 2371. Sound legal principles dictate that removal of the discriminatory "barriers" requires, at the very least, injunctive relief.
The Defendant, State of Washington, has set forth a number of reasons injunctive relief should not be formulated and enforced by this Court: (1) the tremendous costs involved; (2) lack of revenue because of the depressed economy nationally, and more particularly in the State of Washington, i.e., high unemployment and recession in the forest industry which provides much of the State tax revenues); (3) prior State revenue commitments to education, prisons, and social services; (4) the State Constitutions mandated balanced budget; (5) disruption in the State's work force, and of the State's compensation scheme; (6) the State Legislature has already initiated a remedy which will eliminate the sex discrimination by no later than 1993; and (7) the Tenth Amendment to the United States Constitution. This Court finds that Defendant's reasons are without merit and unpersuasive, for the following reasons:
First, Title VII does not contain "...a cost-justification defense comparable to the affirmative defense available in a price discrimination suit. (footnote omitted) ... neither Congress nor the Courts have recognized such a defense under Title VII. (footnote omitted)." Los Angeles Dept. of *868 Water and Power v. Manhart, 435 U.S. 702, 716-17, 98 S.Ct. 1370, 1379-1380, 55 L.Ed.2d 657 (1978).
Second, Defendant's shortage of revenue, prior revenue commitments, and constitutionally mandated balanced budget defenses, cannot withstand the evidence produced at trial herein. It was uncontroverted that in the 1976-77 biennium the State of Washington had a surplus budget[15], was cognizant of the disparity which is the subject of this lawsuit[16], and did not consider the acknowledged discrimination enough of a priority to divert the surplus to the victims of the discrimination. The bad faith of Defendant's action is patent, and cannot be overcome at this late date with arguments that sound in equity.[17]
Third, any disruption full implementation of the proposed injunctive relief would effect, is a direct result of the discrimination Defendant created and has maintained. Sound reasoning dictates that in any cause-effect analysis one cannot be heard to argue the effect is the evil to be eradicated.
Fourth, the belated May 1983 appropriation did not purport to eliminate discrimination.[18] At best, it indicated a change in attitude by the Defendant. As the United States Supreme Court stated in International Brotherhood of Teamsters v. U.S.,
... the District Court and the Court of Appeals found upon substantial evidence that the company had engaged in a course of discrimination that continued well after the effective date of Title VII. The company's later changes in its hiring and promotion policies could be of little comfort to the victims of the earlier post-Act discrimination, and could not erase its previous illegal conduct or its obligation to afford relief to those who suffered because of it. Cf. Albemarle Paper Co. v. Moody, 422 U.S. at 413-423, 95 S.Ct. at 2369-2374. (footnote omitted).
Teamsters, 431 U.S. at 341-342, 97 S.Ct. at 1857-1858.
Further, were the Court to adopt the May 1983 act of the Washington legislature as the injunctive remedy herein, this Court would be endorsing a compensation plan that works a grave injustice to the discriminatees. Title VII remedies are now. The Courts have learned well the lesson taught by Brown v. Board of Education of Topeka, Kansas, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), and its progeny. Injunctive orders couched in terms of "with all deliberate speed" result in non-action. This Court sees no credible distinction between endorsing a remedy to be phased in over a ten (10) year period and an injunction ordering compliance "with all deliberate speed."
It is time, right now for a remedy. Defendant's preoccupation with its budget constraints pales when compared with the invidiousness of the impact ongoing discrimination has upon the Plaintiffs herein.
Finally, Defendants argue that any remedy fashioned by this court ordering the State to pay the Plaintiff's their evaluated worth, today, would be in violation of the Tenth Amendment to the United States Constitution. Defendant's position is incongruous, in that, while contending there is no sex discrimination in employment in the State of Washington,[19] they then argue that the May 1983 Act of the legislature is *869 the only remedy this Court can order. The Court takes this novel position to mean that even though sex discrimination in employment is prohibited by Title VII, which withstood constitutional scrutiny, nevertheless the Tenth Amendment prevents the Federal Courts from fashioning and enforcing an appropriate remedy against the State. Any remedy, other than that provided by the State, would be unconstitutional. There is nothing in the legislative history of Title VII that would indicate that the Federal Courts, after finding sex discrimination in employment, could not then fashion a remedy to eliminate the discrimination. This Court is certain that when Congress amended Title VII in 1972 to extend liability to the States[20] this Tenth Amendment challenge was considered. The Court remains of the abiding conviction that the proposed injunctive relief is consistent with Title VII and the Tenth Amendment.
The Albemarle court addressed, at length, the propriety of back pay in Title VII employment discrimination cases. This Court's decision of whether to award back pay must "be measured against the purposes which inform Title VII."[21] The primary objective, as set forth above, "was a prophylactic one."
It is also the purpose of Title VII to make persons whole for injuries suffered on account of unlawful employment discrimination .... Title VII deals with legal injuries of an economic character occasioned by racial or other antiminority discrimination. The terms "complete justice", and "necessary relief" have acquired a clear meaning in such circumstances. Where [sex] discrimination is concerned, "the [district] court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." Louisiana v. U.S., 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965). And where a legal injury is of an economic character,
"[t]he general rule is, that when a wrong has been done, and the law gives a remedy, the compensation shall be equal to the injury. The latter is the standard by which the former is to be measured. The injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed." Wicker v. Hoppock, 6 Wall. 94, 99, 18 L.Ed. 752 (1867)."
....
The "make whole" purpose of Title VII is made evident by the legislative history.
*870 Albemarle, 422 U.S. at 418-419, 95 S.Ct. at 2372.[22]
Having found unlawful discrimination herein, this court is constrained by Albemarle to analyze the propriety of back pay consonant with the twin statutory objectives of Title VII (i.e., eradicating discrimination throughout the economy and making discriminatees whole).
Albemarle established a threshold an employer must clear before ever it will be heard to rebut the presumption in favor of back pay.[23] The District Court in Albemarle denied back pay, in part, because the Court found that the employers breach of Title VII had not been in "bad faith." The Supreme Court held "[t]his is not a sufficient reason for denying back pay." Albemarle, 422 U.S. at 422, 95 S.Ct. at 2374. The Court then articulated the threshold as follows:
Where an employer has shown bad faithby maintaining a practice which he knew to be illegal or of highly questionable legalityhe can make no claims whatsoever on the Chancellor's conscience. But, under Title VII, the mere absence of bad faith simply opens the door to equity; it does not depress the scales in the employers favor.
Id. (emphasis in original).
Two Supreme Court opinions subsequent to AlbemarleCity of Los Angeles Dept. of Water and Power v. Manhart, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), and Arizona Governing Committee, etc. v. Norris, ___ U.S. ___, 103 S.Ct. 3492, 77 L.Ed.2d 1236 (1983), have denied back pay awards. However, both Manhart and Norris cleared the Albemarle threshold and left it intact.
The evidence in the instant case is clear that the State knew that Title VII, as amended on March 24, 1972, prohibited states from engaging in sex discrimination in employment; that the State knew of the disparity in pay between predominately male and predominately female job classification[24]; and, that the State was on notice of the legal implications of conducting comparable worth studies without implementing a salary structure commensurate with the evaluated worth of jobs.[25] It would seem obvious that when the State passed the 1977 legislation requiring submission to the legislature of comparable worth studies that the State knew its employees would be entitled to pay commensurate with their evaluated worth. Any other conclusion defies reason. It would then follow that the economic consequences of comparable worth were predictable and foreseeable by the State. The State cannot be heard at this late date to argue they were surprised, confused or misled as to the legality of its actions and subsequent failure to pay.
There is little doubt that had the State produced evidence that the unlawful discrimination was other than in "bad faith", the Manhart and Norris decisions would have persuaded this court that back pay would not have been an appropriate remedy. The devastating cost to a Defendant who did not act in bad faith would then, and only then, become relevant. However, the record herein does not lend itself to a finding that the State was acting in good faith by not paying Plaintiff's their evaluated worth. Rather, the persistent and intransigent conduct of Defendant in refusing to pay Plaintiffs indicates "bad faith." The principles set forth in Manhart and Norris are not applicable.
*871 This Court finds that the State had knowledge of the sex discrimination in employment before and after the March 24, 1972 amendment to Title VII; that the evidence shows the discrimination is pervasive and intentional and is still being practiced by the State; and that the State is adhering to a practice of sex discrimination in violation of the terms of Title VII with full knowledge of, and indifference to, its effect upon the Plaintiffs.
Plaintiffs are entitled to declaratory judgment, injunctive relief, and back pay, together with any other relief that may be just and equitable herein.

DECLARATORY JUDGMENT AND DECREE
This Judgment and Decree is based upon the Established Basic Facts and Law, Findings of Fact, Conclusions of Law, and Decision of the Court heretofore entered in this case, all of which by this reference are hereby made a part hereof as though set forth in full herein, now, therefore it is
ORDERED that the Plaintiffs herein are granted declaratory judgment against the Defendant State of Washington, in that the Defendant, is in violation of Title VII as to the non-payment to Plaintiffs of compensation in their employment, it is further
ORDERED that Plaintiffs are entitled to injunctive relief, it is further
ORDERED that the Class includes all female and male employees of all job classifications under the jurisdiction of DOP and HEPB, which were 70% or more female as of November 20, 1980, or anytime thereafter, it is further
ORDERED that the Plaintiffs, as individual members of the Class, are entitled to back pay, commencing from September 16, 1979, it is further
ORDERED that in addition to back pay, Plaintiffs are entitled to all fringe benefits. Interim earnings or amounts earnable with reasonable diligence by each Plaintiff or persons discriminated against shall operate to reduce the back pay otherwise allowable, it is further
ORDERED that this Court will appoint a Master to assist the Court in the implementation of this decree, it is further
ORDERED that this Court will retain jurisdiction of this case to take evidence, to make rulings, and to issue such orders as may be just, and proper upon the facts and law and in implementation of this decree, it is further
ORDERED that costs and attorney's fees will be decided at a later time.
NOTES
[1] The individuals who filed charges with the EEOC are the same individuals who were named in the complaint, filed in this Court on July 20, 1982, seeking to represent the class. The individuals are: Ms. Willie Mae Willis, Mr. Milton Tedrow, Ms. Gail Spaeth, Ms. Penney-Comstock Rowland, Ms. Lauren McNiece, Ms. Peggy Holmes, Ms. Exa T. Emerson, Ms. Helen Castrilli, and Ms. Louise Peterson.
[2] The November 20, 1980 date was derived by counting back 300 days from the September 16, 1981 date when the class representatives (see Footnote 1) filed charges with the EEOC. Williams v. Owens-Illinois, Inc., 665 F.2d 918, 923, n. 2 (9th Cir.1982).
[3] See Footnote 1, supra.
[4] This quotation is taken from the charges filed by AFSCME and WFSE-AFSCME Council 28. The wording of the charges filed by the individual Plaintiffs is similar, varying according to the job held by the individuals.
[5] Usery, Hodel, and EEOC v. Wyoming, involved challenges to "congressional commerce power legislation." That such legislation is distinguishable from "congressional § 5 of the Fourteenth Amendment power legislation," such as Title VII, is clear from the following excerpt from Hodel:

National League of Cities expressly left open the question "whether different results might obtain if congress seeks to affect integral operations of state governments by exercising authority granted it under other sections of the Constitution such as the spending power, Art. I, § 8, cl. 1, or § 5 of the Fourteenth Amendment," 426 U.S. at 852, n. 17, 96 S.Ct., at 2474, n. 17. In Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), the Court upheld Congress' power under § 5 of the Fourteenth Amendment to authorize private damages actions against state governments for discrimination in employment. The Court explained that because the Amendment was adopted with the specific purpose of limiting state autonomy, constitutional principles of federalism do not restrict congressional power to invade state autonomy when Congress legislates under § 5 of the Fourteenth Amendment. Id., at 452-456, 96 S.Ct., at 2669-2671....
Hodel, 452 U.S. at 287, n. 28, 101 S.Ct. at 2366, n. 28.
[6] The Three-prong test is as follows:

(1) The complaint "touches a sensitive area of social policy upon which the federal courts ought not to enter unless no alternative to its adjudication is open."
(2) "Such constitutional adjudication plainly can be avoided if a definitive ruling on the state issue would terminate the controversy."
(3) The possible determinative issue of state law is doubtful.
Badham, at 1172.
[7] The three-prong test, set forth in Footnote 6 is conjunctive, as opposed to disjunctive. Accordingly, failure of any one prong compels a court's denial of a motion to abstain.
[8] Arizona Governing Committee, etc. v. Norris, ___ U.S. ___, 103 S.Ct. 3492, 77 L.Ed.2d 1236 (1983).
[9] There have been four (4) "Comparable Worth" studies conducted by the Department of Personnel and the Higher Education Personnel Boardthe original study in 1974, and update studies in 1976, 1979 and 1980.

Using trained evaluation committees, the same point-factor evaluation system was used in each study. Each job class was assessed using the following four evaluation components:
(1) Knowledge and Skills
 Job Knowledge
 Interpersonal Communications Skills
 Coordinating Skills
(2) Mental Demands
 Independent Judgment
 Decision making, problem solving Requirements
(3) Accountability
 Freedom to Take Action
 Nature of the Job's Impact
 Size of the Job's Impact
(4) Working Conditions
 Physical Efforts
 Hazards
 Discomfort Environmental Conditions
The total of the value of these four components constituted the final point value of the class.
[10] See Footnote 9, supra.
[11] In 1888 one Nevada M. Bloomer filed a lawsuit in the District Court at Spokane Falls, Washington. Bloomer v. Todd, et al., 3 Wash. Terr. 599, 19 P. 135 (1888). She was suing certain judges of election who were conducting the regular municipal election in one of the wards in the City of Spokane Falls for fraudulently, maliciously and without sufficient cause, and with intent to injure her, refusing to receive her ballot. The District Court sustained Defendant's demurrer to the complaint. The Supreme Court of the Territory of Washington, on August 14, 1988, affirmed the District Court.

The only issue in the case was whether females were qualified electors under the laws of Washington Territory? One of the admitted facts was "the Plaintiff is a woman." Id., at 611. Mr. Chief Justice Jones delivered the opinion of the Court. In reaching his conclusion, the learned Chief Judge stated: "In 1852, when this act was passed, the word `citizen' was used as a qualification for voting and holding office, and, in our judgment, the word then meant and still signifies male citizenship, and must be so construed." Id., at 623. (Langford, J., and Allyn, J. concurred.)
In view of the foregoing it is apparent that discrimination against women was lawful in Washington Territory. In fact, discrimination was lawful in the State of Washington until 1971 when the State's Civil Rights Law was amended to prohibit sex discrimination.
Perhaps Defendant adopted the practices and concepts of sex discrimination against women in employment as just another manifestation of centuries old discriminatory attitudes and practices of a male dominated society. The Declaration of Independence probably sheds some light on the practices and concepts of sex discrimination so rampant in this country. "... That all men are created equal; That they are endowed by their creator with certain inalienable rights; That among these are Life, Liberty, and the Pursuit of Happiness." The female gender is conspicuously absent in the Declaration of Independence.
[12] FF Nos. 12, 13, 16, 18, 24, and 25.
[13] FF Nos. 27, 30, 31, 35, 36, and 38.
[14] Wash.Laws 1983, 1st Ex.Sess., Ch. 75 and Ch. 76 § 135.
[15] FF No. 24.
[16] FF Nos. 18 and 25.
[17] The Defendant argues that it is ironic that the State of Washington was the first in the nation to consider and adopt the comparable worth rating system, and now is the first to be penalized with a devastating court ruling. This court is of the opinion that it is indeed ironic and tragic that the State of Washington is in the eighth decade of the Twentieth Century attempting to use the American legal system to sanction, uphold and perpetuate sex bias. Defendants are struggling to maintain attitudes and concepts that are no longer acceptable under the provisions of Title VII.
[18] Wash.Laws 1983, 1st Ex.Sess., Ch. 75.
[19] The State's own studies show sex discrimination. No matter what Defendant elects to call itdisparity, pay equity or whatever, the only effect is sex discrimination. What other logical reason can there be for the Defendants adoption of the "comparable worth" theory of compensation.
[20] 1972 Amendment, Subsec. (a). Pub.L. 92-261, § 2(1).
[21] The Ninth Circuit Court of Appeals succinctly set forth the purposes underlying the passage of Title VII by the Congress of the United States in Lynn v. Regents of the University of California, 656 F.2d 1337 (9th Cir.1981).

While we might not have made the statement in the text which accompanies this note a number of years ago, today its truth seems self-evident. The history of our nation reflects the evolution of our understanding of the nature of man (in the generic sense of the word) and the legitimate aspirations and rights of the individual. Attitudes which seemed benign at one time are now understood to be discriminatory. Compare Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) with Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896). The beliefs that women should not have the right to vote, to practice law, or serve on the United States Supreme Court, were once reflective of the majority view, and the law. We now understand somewhat belatedly, that these concepts reflect a discriminatory attitude. Today any person is free to hold to such concepts, but such concepts may not serve as the basis for job-related decisions in employment covered by Title VII. Other concepts reflect a discriminatory attitude more subtly; the subtlety does not, however, make the impact less significant or less unlawful. It serves only to make the court's task of scrutinizing attitudes and motivation, in order to determine the true reason for employment decisions, more exacting. We are saying only what Title VII commands: when Plaintiffs establish that decisions regarding academic employment are motivated by discriminatory attitudes relating to race or sex, or are rooted in concepts which reflect such discriminatory attitudes, however subtly, courts are obligated to afford the relief provided by Title VII.
[22] Although the Albemarle decision involved Negro claimants contesting employment discrimination, this Court can see no realistic distinction between discrimination on the basis of race or sex. The results are just as invidious and devastating. There is nothing in Title VII that distinguishes between race and sex in the employment discrimination context.
[23] A finding of a violation of Title VII presumptively entitles the victims of discrimination to back pay and other appropriate equitable relief. Albemarle Paper Co., supra; Franks v. Bowman Transportation Co., 495 F.2d 398 (5th Cir.1974), rev'd on other grounds, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). This presumption is justified by both the deterrent and "makewhole" purposes at the core of Title VII. Albemarle.
[24] FF Nos. 18 and 25.
[25] Plaintiff's Exhibit 110.